366 F.2d 136
 James THOMAS III, and Boyd Thomas, Appellants,
v.
COLORADO TRUST DEED FUNDS, INC., Mortgage Underwriting Corporation, Clifford McLin, Robert Swanson, Receiver for Colorado Trust Deed Funds, Inc., and Mortgage Underwriting Corporation, Appellees.
 No. 8079.
 United States Court of Appeals Tenth Circuit.
 July 20, 1966.
 Rehearing Denied October 17, 1966.
 
 William G. Robertson, of Gray, Pfaelzer & Robertson, Los Angeles, Cal. (James E. Biava, of Gray, Pfaelzer & Robertson, Los Angeles, Cal., and Thomas K. Loughlin, of Adams & Loughlin, Denver, Colo., with him on the brief), for appellants.
 Robert Swanson, Receiver Colorado Trust Deed Funds, Inc. and Mortgage Underwriting Corporation, Denver, Colo., for appellees.
 Before PICKETT, HILL and SETH, Circuit Judges.
 PICKETT, Circuit Judge.
 
 
 1
 This appeal involves the authority of an attorney of record to stipulate to a final disposition of a case. The trial court, holding that appellants had failed to prove that their attorney was not authorized to enter into the stipulation, denied a motion to vacate the judgment entered thereon.
 
 
 2
 In 1960 appellants, James Thomas III and his brother Boyd, were engaged in the development and sale of real property in California and desired to acquire an insurance company authorized to insure the payment of the real estate mortgages. In November, 1960, the Thomases purchased all the outstanding stock of Mortgage Insurance Company of America, a Colorado corporation with its principal place of business in Denver, Colorado, and thereby acquired ownership and control of two subsidiary Colorado corporations, Colorado Trust Deed Funds, Inc., and Mortgage Underwriting Corporation. James Thomas then became president and Boyd Thomas vice president of these corporations and designated Clifford McLin as general manager thereof.
 
 
 3
 From the date of acquisition of the corporations, securities in the nature of trust deed certificates were sold and offered for sale to the public. On April 25, 1961, the Securities and Exchange Commission brought an action against Colorado Trust Deed Funds, Inc., Mortgage Underwriting Corporation, James Thomas III, Boyd Thomas, and Clifford McLin, alleging violation of the Securities Act, 15 U.S.C. § 77q(a), (2) and (3), praying for (1) an injunction against further sale of securities, and (2) the appointment of a receiver for the corporate defendants. Shortly thereafter James Thomas and McLin, with attorney Duncan Cameron who had been engaged to represent the defendants in this matter, arranged for a conference with S.E.C. representatives to discuss the lawsuit, and pursuant to this conference, on May 2, 1961, James Thomas and attorney Cameron appeared in the District Court with the S.E.C. attorney and stipulated to the entry of an injunction forbidding further sale of securities and disbursements of corporate assets. The request for the appointment of a receiver was deferred. At this meeting James Thomas, anxious to avoid receivership, had represented that there was available secured notes valued at approximately $300,000 which could be deposited into Colorado Trust Deed Funds, Inc. as additional assets, together with a certain amount of cash. The S.E.C. expressed interest in the proposal and suggested that it be submitted in writing. Cameron accordingly prepared an offer for submission to the S.E.C. and forwarded it to James Thomas in California, but no response was forthcoming.
 
 
 4
 On May 17, 1961, McLin engaged attorney Russell Bartels specifically to assist Cameron in negotiating settlement with S.E.C. which would eliminate the need for receivership and permit the corporation to continue business. Cameron withdrew from the case, and Bartels became the attorney of record for all the defendants. After familiarizing himself with the case, Bartels submitted to the S.E.C. representative a proposal for settlement. When the S.E.C. attorney told Bartels that he did not have authority to accept the proposal, Bartels went to Washington, D. C. to confer with the S.E.C. General Counsel. A few days later the S.E.C. representative in Denver was authorized to accept the proposal after obtaining additional information.[1] A stipulation was then prepared and executed by Bartels, who stated that he had "talked to Jimmy in California last night, and he said `Go ahead'." The stipulation provided that the Thomases would assign to Colorado Trust Deed Funds, Inc. secured promissory notes valued at $300,000, and $50,000 in cash. On July 13, 1961, the United States District Court entered an order designated "Final Judgment" adopting and approving the stipulation and declaring it to be in full force and effect. The S.E.C. was permitted to withdraw its request for the appointment of a receiver, the injunction was dissolved, and the funds and assets were released to the corporations.
 
 
 5
 The deposits were not made, however, and upon inquiry Bartels informed the S.E.C. that the parties were in the process of complying with the provisions of the stipulation. Bartels, at the request of McLin, went to California to assist in clearing the title to the property which was to be used as security for a bank loan necessary to comply with the stipulation. He conferred with McLin and an attorney for several corporations in which the Thomases had a controlling interest. For the first time he met James and Boyd Thomas, but so far as the record shows, the stipulation was not discussed inasmuch as Bartels apparently assumed that they were aware of it. This meeting was brief, and for the purpose of signing some corporation resolutions. Bartels' first information that all the interested parties were not fully advised of his negotiations with the S. E.C., including the stipulation, was when James Thomas came to Denver early in August. After James Thomas arrived in Denver, conferences were held and it was concluded that Bartels should not get in touch with the S.E.C. on the question of the validity of the order until after an attempt had been made to modify the requirements of the stipulation. When the S.E.C. representatives in Denver failed to give a new plan favorable consideration, Bartels and James Thomas proceeded to Washington, D. C. where modification attempts were still unsuccessful after a conference with officials there. Thereupon a motion to vacate the judgment was prepared by Bartels and signed by attorney Littell,[2] alleging that the stipulation had been entered into by Bartels without the Thomas' authority.[3] After hearing all the evidence, the court denied the motion, stating that it was "inconceivable" that Bartels had executed the stipulation without the knowledge or authorization of the Thomases. Only the Thomases have appealed.
 
 
 6
 At the hearing on the motion to vacate, James Thomas testified that he first learned of the stipulation and the judgment entered thereon from the former owner of the defendant corporations; that he immediately went to Denver where he met Bartels and was advised that he was obligated to comply with the provisions of the stipulation; that until his arrival in Denver he did not know that Bartels was the attorney of record in the Colorado litigation; that he did not know of the stipulation or its requirements;[4] and that he did not authorize Bartels or anyone else to agree to the provisions of the stipulation. Boyd Thomas likewise testified that the stipulation was totally unauthorized insofar as he was concerned.
 
 
 7
 Bartels testified that he had been employed by McLin and had never met or communicated directly with either of the Thomases prior to the execution of the stipulation; that he relied primarily upon McLin for his authority and had numerous discussions with him concerning the proposed settlement with the S.E.C.; that he also discussed the proposed settlement with attorney Littell; that copies were furnished to Littell and McLin with directions that they should be forwarded to the Thomases.[5] McLin told Bartels he would be paid for his services by James Thomas, and such payment was in fact made on August 8, 1961. McLin testified that he discussed the employment of Bartels with James Thomas before Bartels agreed to enter the case.
 
 
 8
 Rule 60(b), F.R.Civ.P., provides that a party may be relieved from a final judgment or order for any reason justifying such relief. A motion under this rule is addressed to the sound discretion of the court and must be clearly substantiated by adequate proof. Abel v. Tinsley, 10 Cir., 338 F.2d 514; Consolidated Gas & Equipment Co. of America v. Carver, 10 Cir., 257 F.2d 111; Lane v. Swingspout Measure Co., 7 Cir., 341 F.2d 40; MacLeod v. D. C. Transit System, Inc., 108 U.S.App.D.C. 399, 283 F.2d 194. The law is settled that an attorney of record may not compromise, settle, or consent to a final disposition of his client's case without express authority. Radosevich v. Pegues, 133 Colo. 148, 292 P.2d 741; Anno. 66 A.L.R. 107, 30 A.L.R.2d 944; 7 C.J.S. Attorney and Client §§ 86, 105a. However, this general principle must be considered in connection with the rule that an attorney of record is presumed to have authority to compromise and settle litigation of his client, and a judgment entered upon an agreement by the attorney of record will be set aside only upon affirmative proof by the party seeking to vacate the judgment that the attorney had no right to consent to its entry. United States v. Beebe, 180 U.S. 343, 21 S.Ct. 371, 45 L.Ed. 563; Feldman Inv. Co. v. Connecticut Gen. Life Ins. Co., 10 Cir., 78 F.2d 838; 7 C.J.S. Attorney and Client § 73(b). See, also, Hot Springs Coal Co. v. Miller, 10 Cir., 107 F.2d 677, and authorities cited therein.
 
 
 9
 After carefully considering the record, we are satisfied that James Thomas III did not establish that Bartels was without authority to enter into the stipulation, and the court did not abuse its discretion in overruling the motion to vacate. As to Boyd Thomas, however, the record shows that he did not participate in the transactions and negotiations with the S.E.C. and did not consent to the execution of the stipulation or the entry of the judgment. The question of the extent of liability for failure to comply with the stipulation and judgment approving and adopting it is not presented here.
 
 
 10
 The judgment is reversed as to Boyd Thomas, and affirmed as to James Thomas III.
 
 
 
 Notes:
 
 
 [1]
 The requested information included financial statements of James and Boyd Thomas, and required affidavits. McLin, who was in California, obtained these documents duly executed by the Thomases and returned them to Bartels
 
 
 [2]
 Littell has been referred to throughout this proceeding as the "personal attorney of James Thomas."
 
 
 [3]
 This motion was accompanied by a petition for corporate reorganization under Chapter X of the Bankruptcy Act prepared by Bartels. An order denying the petition for reorganization was affirmed by this court, In Re Colorado Trust Deed Funds, Inc., 10 Cir., 311 F.2d 288. A receiver for Colorado Trust Deed Funds, Inc., and Mortgage Underwriting Corporation was appointed with the consent of all parties on December 6, 1961; the receivership has continued to the present time. Bartels continued to represent Thomas' corporations in Colorado
 
 
 [4]
 The deposits required by the stipulation, although not identical, were substantially the same as James Thomas had suggested could be furnished when the matter was discussed at the time the injunction was consented to
 
 
 [5]
 In this connection, Bartels testified:
 "Q. And who did you discuss it with before you presented it to the Securities and Exchange Commission? A. Well, the day before this was prepared, I had a conference in Mr. Littell's office with Mr. McLin and Mr. Littell. And notes were made on it, on the proposal that I had with respect to the changes and the additions that could be made. The following morning, this letter of June the 7th was then typed in my office and was presented to the Securities and Exchange Commission. I do not recall that I talked to anybody about it on that day before presenting it to the Commission, but copies of it were mailed to Mr. McLin and, I believe, to Mr. Littell.
 Q. Didn't you furnish copies of it to Mr. McLin with directions to provide copies to the Thomases? A. Yes, I did.
 Q. How many copies did you give to Mr. McLin? A. I would say that I sent Mr. McLin at least three copies.
 Q. All right. And did Mr. McLin later advise you, sir, that he had discussed the matter with the Thomases? A. Yes.
 Q. And did he advise you that the Thomases agreed to the terms thereof?
 A. Yes."