**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 21 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MICHAEL SHOELS and VONDA
SHOELS, as parents of decedent
ISAIAH SHOELS,

        Plaintiffs-Appellants,

   v.

THOMAS KLEBOLD, SUSAN
KLEBOLD, WAYNE HARRIS, and
KATHERINE HARRIS,

        Defendants-Appellees,

and

JEFFERSON COUNTY SHERIFF
JOHN STONE, individually and in his
official capacity, FORMER
JEFFERSON COUNTY SHERIFF
RONALD BECKHAM, individually
and in his official capacity,
JEFFERSON COUNTY SHERIFF'S
DEPARTMENT, NEIL GARDNER,
individually, JOHN HICKS,
individually, MARK M. MILLER,
individually, T. WILLIAMS,
individually, MIKE GUERRA,
individually, PHILIP LEBEDA,
individually, JOHN or JANE DOES 2
THROUGH 10 (all deputies in the
Jefferson County Sheriff's
Department), individually,
JEFFERSON COUNTY SCHOOL

No. 03-1295

DISTRICT R-1, FRANK DeANGELIS, individually and in his official capacity, HOWARD CORNELL, individually and in his official capacity, PETER HORVATH, individually, WILLIAM BUTTS, individually, GARRETT TALOCCO, individually, JUDY KELLY, individually, TOM TONELLI, individually, TOM JOHNSON, individually, JOHN or JANE DOES 11 THROUGH 30, individually, JAMES ROYCE WASHINGTON, RONALD F. HARTMAN, J.D. TANNER, doing business as Tanner Gun Show, PHILLIP DURAN, MARK MANES, and ROBYN ANDERSON,

　　　　Defendants.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 00-B-1614)**

---

Geoffrey Nels Fieger (Victor S. Valenti with him on the briefs), Fieger, Fieger, Kenney & Johnson, P.C., Southfield, Michigan, for Plaintiffs-Appellants.

C. Michael Montogomery (Steven G. Greenlee with him on the brief), Montgomery, Kolodny, Amatuzio & Dusbabek, L.L.P., Denver, Colorado, for Defendants-Appellees Wayne Harris and Katherine Harris.

Frank D. Patterson (Gregg E. Kay and Kerri J. Atencio with him on the brief), Patterson, Nuss & Seymour, P.C., Englewood, Colorado, for Defendants-Appellees Thomas Klebold and Susan Klebold.

---

Before **EBEL, ANDERSON,** and **McCONNELL** , Circuit Judges.

-2-

**McCONNELL** , Circuit Judge.

Five years after the tragedy at Columbine High School, we are called to determine whether the district court rightly put to rest a lawsuit between Michael and Vonda Shoels, whose son Isaiah was killed at Columbine, and the parents of the two shooters. Over strenuous objection, the district court found that the Shoels, through counsel, had entered a binding agreement to settle their claims in April of 2001. Because the Shoels have provided us with no reason to think that the district court's factual findings were clearly erroneous, we affirm the order of the district court.

## BACKGROUND

In the year 2000, Michael and Vonda Shoels sued a number of defendants for failing to prevent or facilitating the killing of their son. Two groups of defendants are relevant to this appeal: first, the Harrises and Klebolds, parents of the shooters, and second, three associates of the shooters named Mark Manes, Phillip Duran, and Robyn Anderson, who were later added to the lawsuit (collectively referred to as the "Manes group"). The Shoels' primary legal counsel was Geoffery Fieger, a Michigan attorney who retained the exclusive right to communicate with the Shoels and, for the most part, was the only one authorized to negotiate on their behalf. Mr. Fieger worked with Jack Beam &

-3-

Associates as local counsel, and especially with Douglas Raymond, an associate at that firm. In the summer of 2000, Mr. Fieger specifically authorized local counsel to offer to settle with the Harrises and Klebolds if they would pay the policy limits of their homeowner's insurance to the Shoels and one other family.

Reluctant to settle with the families of two victims without simultaneously resolving the potential claims of all the other victims and their families, the Klebolds suggested that they might want to involve other potential plaintiffs in the process. Mr. Beam urged them not to do so, and warned in a letter that their offer was "the only attempt which will be made by these families . . . to settle within your clients' policy limits," and that "settlement with Mr. Fieger's clients will substantially reduce the Klebolds' personal exposure by not facing a trial with a lawyer with Mr. Fieger's elan." App. 192-93.

In the following months, a growing number of potential claimants became involved in trying to work out a global settlement. One of the attorneys, Stephen Wahlberg, emerged as the primary spokesman for these plaintiffs. While he was not authorized to act on behalf of any other attorneys' clients, he was the intermediary who would relay communications back and forth between the various defendants and the various plaintiffs. In September of 2000, he demanded that the Klebolds, Harrises, and Mark Manes pay their policy limits in full (an aggregate amount of roughly $2.4 million) to a group of thirteen plaintiffs

in return for releasing their claims. Although formally included in this group, the Shoels remained tentative about actually accepting a settlement until they knew more definitely the amount they could expect to receive.

In November of 2000, the Klebolds, the Harrises, and Mark Manes made a counteroffer. They pointed out that there were still twenty-four potential claimants outside of Mr. Wahlberg's group, whose claims would not be resolved by the proposed settlement. Six of those claimants, represented by Jim Rouse, had refused to join Mr. Wahlberg's coalition despite substantial efforts to include them. In their opinion, any settlement that allowed the Harrises and Klebolds to resolve the claims against them using only insurance proceeds – and thereby to escape "scot-free" with respect to their personal assets – was unacceptable. They wanted the Harrises and Klebolds to pay personally for the victims' losses, at least to some extent, and apparently also demanded a chance to confront the Harrises and Klebolds face to face. The other eighteen had not been represented by counsel up to that point, and it was not known whether they were interested in pursuing their potential legal claims. The defendants acknowledged that it was unlikely that Mr. Rouse's group would settle, but offered to settle with the remaining thirty-one claimants for $1.6 million, assuming that the Wahlberg group could get the other eighteen to agree.

To muster the required consensus, Mr. Wahlberg's group enlisted the help of an organization called the Judicial Arbiter Group, an association of retired judges who provide alternative dispute resolution services. The group agreed to help contact the remaining victims and/or their families; one of its members, Judge Jim Carrigan, agreed to help the various plaintiffs divide the settlement proceeds by serving as an arbiter who would determine the relative value of each claim, based on the claimant's damages and likelihood of success. Eventually, all but four of the eighteen families agreed to join in the Wahlberg settlement negotiations, and the remaining four seemed unlikely to sue at all. In March 2001, arbitration agreements were sent out to each of the twenty-seven participating families. Because Mr. Raymond, the Shoels' local counsel, had not received the Shoels' copy in early April, Mr. Wahlberg sent a second copy of the arbitration agreement on April 13, stating that everyone else had signed and requesting the Shoels' signature.

Meanwhile, the parties continued to negotiate which plaintiffs would settle with each group of defendants, how much of their insurance proceeds each group of defendants would pay to settle the plaintiffs' claims, and how much they would be allowed to set aside to defend against any other claims not covered by the settlement. On March 14, Mr. Wahlberg faxed to the Shoels' counsel a letter from Mr. Rouse confirming that his clients would not settle with the Klebolds and

Harrises. Then, on April 9, Mr. Wahlberg advised the Shoels' counsel that Mr. Rouse thought his clients would participate in arbitration of their claims against Defendants Manes and Duran. Mr. Wahlberg also speculated that some of Mr. Rouse's clients might have second thoughts about the Klebolds and Harrises as well.

A settlement conference was held on April 10, 2001, the results of which were sent by fax to the parties (including Jack Beam, local counsel for the Shoels) in a letter dated April 16. That letter made it clear that the Rouse plaintiffs were not participating in the settlement with the Klebolds and Harrises, but suggested that they would participate in the other settlements. In the Klebold/Harris negotiations, the parties ultimately agreed that instead of negotiating the amount to be reserved for the Rouse group and other nonparticipating claimants, they would let the arbiter determine it. According to the final proposal set forth in the letter, the Harrises and Klebolds would put 98% of their insurance policy limits ($1,568,000) into escrow, leaving the other 2% to cover possible zone-of-danger claims. Then, the arbiter would determine what share of the escrowed funds each potential claimant (including the nonsettling claimants) should receive. The amounts attributable to nonsettling plaintiffs would be held in reserve to cover any successful claims, and any unused portion of those funds would be distributed to the settling plaintiffs after the statute of limitations expired.

The proposed settlements with Defendants Manes, Anderson, and Duran had a similar structure, with one exception: those defendants refused to pay their insurance proceeds unless everyone, [1] including the Rouse group, agreed to release their claims. Furthermore, Defendants Manes and Duran were likely judgement-proof, and Anderson was threatening to file for bankruptcy if a unanimous settlement was not reached; this made proceeding to trial considerably less attractive. According to the April 16 letter, Mr. Manes had agreed to deposit $720,000 of insurance proceeds immediately and hold the remaining $80,000 in reserve until the statute of limitations ran. Mr. Duran had "preliminarily" agreed to deposit $250,000 of his insurance money so long as everyone participated, and Ms. Anderson had $300,000 of insurance proceeds available for settlement, though her settlement proposal was not yet finalized.

By April 18, the six families represented by Jim Rouse had definitely agreed to settle with the Manes group. This left only the Shoels who had not committed to settle with those defendants. Mr. Wahlberg called Mr. Raymond, explained that "everyone else was on board," including the Rouse group, and said that it was time for the Shoels to make a choice. In Mr. Wahlberg's recollection, it was clear that he was speaking about the negotiations with Manes, Anderson,

---

[1]This apparently did not include the four potential claimants who had refused to participate in any settlement negotiations whatsoever.

and Duran. Two days after the April 18 conversation, however, Mr. Raymond claimed that Mr. Wahlberg falsely led him to believe that the Rouse group was settling with the Harrises and Klebolds as well. In any event, Mr. Raymond said that he would have to speak with Mr. Fieger and his clients. They were not able to reach Mr. Fieger that day, but the next morning (April 19) Mr. Wahlberg had another conversation with Mr. Raymond and someone at Mr. Fieger's office, again stressing that the Shoels needed to decide what they were going to do and give him something in writing. Later that same morning, Mr. Fieger's office sent a letter to Mr. Wahlberg, apparently signed by Mr. Fieger, [2] which read as follows:

> This letter shall serve to confirm that Mr. and Mrs. Shoels have approved settlement with Defendants Klebold, Harris, Manes, Anderson, and Duran.

App. 153. Mr. Wahlberg immediately faxed that letter on to counsel for the Klebolds and Harrises, together with a general acceptance letter on behalf of all the claimants.

---

[2]Mr. Fieger testified at the hearing that it was actually a secretary who drafted, signed, and sent the letter at his instruction, and that he had never meant to do more than express the Shoels' continued willingness to be part of the negotiations without committing to be bound by the arbitration. As far as we can tell from the record, he did not come forward with this story until more than a year after the April 19 letter was sent, even though he disputed the existence of a settlement agreement almost immediately. Furthermore, on cross-examination, Mr. Fieger expressed some uncertainty about whether he had signed the letter. The district court found Mr. Fieger's claim that the letter was "misworded" to be unbelievable, Op. 9, and we will not second-guess its credibility determinations.

Within twenty-four hours, this apparently successful conclusion to the settlement negotiations began to unravel. When the Shoels' attorneys realized that the Rouse group was not settling with the Klebolds and Harrises, they immediately repudiated the agreement. Mr. Raymond sent a letter saying that they were "shocked" that the Rouse group was not settling with the Klebolds and Harrises, which he considered "contrary to the representation that 'everybody is on board except the Shoels.'" He redescribed Mr. Fieger's letter as saying that the Shoels had "tentatively approved settlement," and insisted that the Shoels would not settle until they got "the full deal in writing." App. 202.

That same day, Mr. Wahlberg wrote back, expressing dismay that Mr. Raymond was "shocked" and reviewing the terms of the settlement. App. 582. Mr. Raymond responded, saying, "I want to make it clear to you that we were not shocked that there was a settlement. We were shocked that there was a settlement that did not include Rouse's group as to Klebold and Harris." App. 180. Over the next several days, Mr. Fieger requested more information about the precise amount that the Shoels could expect to receive. Mr. Wahlberg explained the agreed-on process and that until the arbiter had ruled, it was impossible to put a precise value on the Shoels' claim under the settlement. However, he eventually estimated that the Shoels' claim might be valued at somewhere between $28,000 and $84,000. Mr. Fieger responded that his clients would " *never* settle a claim

-10-

with the Harris[es] and Klebolds wherein they stand to receive $28,000-84,000."
App. 215 (emphasis in original). [3] At one point in the correspondence, Mr. Wahlberg wrote that the Shoels would not be bound by the April 19 letter because they had not yet signed any agreements. However, after further discussions with counsel for the Harrises (who were less forgiving), he wrote back, saying that he had been mistaken and that the Shoels, like all the other parties, were bound by the settlement agreement reached on April 19.

The official claim releases were not signed until that August, after the arbitration was complete (but before its results were disclosed). The Shoels signed their final releases against Manes, Anderson, and Duran, but not against the Klebolds and Harrises. Although the Harrises and Klebolds maintained their position that the Shoels were bound by their April 19 acceptance, they did make further settlement overtures to the Shoels, in hopes they could persuade the Shoels not to contest the validity of the settlement agreement. When those negotiations broke down, the Shoels moved to have their case sent back to state court (where Mr. Fieger was confident that he could get the case to a jury), and the Klebolds and Harrises brought motions to enforce the settlement agreement. After an evidentiary hearing in March of 2003, the district court determined that

---

[3]Apparently, Mr. Fieger lost this focus on the bottom line sometime between the Spring of 2001 and oral argument, where he insisted that the dispute was "not about the money."

the Shoels had accepted an offer to settle on April 19, and that they were bound by their contract.

DISCUSSION

"A trial court has the power to summarily enforce a settlement agreement entered into by the litgants while the litigation is pending before it." *United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir. 1993). We review the district court's decision to enforce such an agreement for an abuse of discretion. *Id.* at 1495. An abuse of discretion occurs when the district court "based its decision on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Wang v. Hsu*, 919 F.2d 130, 130 (10th Cir. 1990). Issues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law. *United States v. McCall*, 235 F.3d 1211, 1215 (10th Cir. 2000).

In this appeal, Appellants present three primary arguments for overturning the district court's enforcement of the settlement agreement. First, they argue that Mr. Fieger did not have his clients' express authority to settle the claims, making his April 19 letter *ultra vires* and hence invalid. Second, they argue that the terms of the settlement were too vague to constitute a binding agreement, and were at most a preliminary agreement to agree. Third, they argue that their mistake about the Rouse group's participation, which they claim was caused by Mr. Wahlberg's

misrepresentation, gave them the option of voiding the contract, which they immediately did. We consider each contention in turn.

I

Relying on the settled Colorado rule that an attorney cannot settle a claim unless the client expressly authorizes him to do so, the Shoels first argue that Mr. Fieger had no authority to settle their claims on their behalf. *See Cross v. Dist. Court*, 643 P.2d 39, 41 (Colo. 1982) (en banc) ("[A]s we have stated on numerous occasions, an attorney does not have the authority to compromise and settle the claim of his client without the knowledge or consent of his client.") In response, Appellees point out that Mr. Fieger himself testified that he had exclusive authority to negotiate on behalf of the Shoels, and that in June of 2000 he authorized local counsel to "make a settlement" offer. Of course, that evidence is not dispositive; an attorney may be authorized to negotiate even if the client retains sole authority to sign off on the final agreement, and the fact that an attorney has his client's consent to authorize an offer in one case does not prove that he has it to accept a very different offer several months later.

More helpful is Appellee's citation to *Thomas v. Colorado Trust Deed Funds, Inc.*, 366 F.2d 136, 139 (10th Cir. 1966), where this Court held that there is a presumption that an attorney has express authority to settle unless there is evidence to the contrary in the record. When they first disputed the settlement,

counsel for the Shoels never claimed that their clients had not signed off on the acceptance or that Mr. Fieger had been acting contrary to his clients' wishes. Appellants now cite evidence that, at earlier stages of negotiations, they had refused to settle without knowing in advance the ultimate dollar value they would receive. Mr. Fieger strains to read this as evidence of a limitation on his authority to settle, but we are not convinced. Parties often relax their supposedly non-negotiable demands over the course of negotiations, and the mere fact that a party does so through counsel does not suggest that counsel has exceeded the scope of his express authority. Of course, counsel for the Shoels did renew their demand for a precise figure after April 19, but only once they learned that the Rouse group was not participating. Appellants' position seems to have been that, despite their demand for a fixed settlement amount, if all the other attorneys agreed to the arbitration procedure, they would not be "the sole laggards" or "obstructionists." App. 481. Thus, even if Mr. Fieger's long refusal to settle except in return for a fixed dollar amount were probative of a corresponding limitation on his authority, his apparent willingness to settle so long as the Rouse group settled – even before the arbiter had determined what the Shoels would receive – would be just as probative of his authority to do so.

Evidence about the Shoels' general negotiating position provides at best indirect evidence for whether the Shoels really did change course and agree to the

arbitration process by April 19. The most direct evidence is the text of the April 19 letter itself: "This letter shall serve to confirm that Mr. and Mrs. Shoels *have approved* settlement with Defendants Klebold, Harris, Manes, Anderson and Duran." App. 153 (emphasis added). If one takes that sentence at face value, it states that the Shoels either approved the agreement themselves or authorized Mr. Fieger to do so. Admittedly, the record also contains a few stray remarks that could possibly be read to indicate a lack of authority; for instance, Mr. Fieger did testify that the Shoels "had already indicated they refused to sign the [arbitration] agreement" in the days leading up to April 19, suggesting that they were still refusing to participate when the acceptance letter was sent. App. 482. But that testimony was all in support of Mr. Fieger's claim that his letter was "misworded," and that in fact neither he nor the Shoels meant to commit to settlement on April 19. The district court specifically discredited that claim. Thus, the facts as found by the district court establish that Mr. Fieger, at least, intended to settle. Op. 9. In light of the language of Mr. Fieger's letter and the presumption that an attorney does not act without authorization, the most natural conclusion is that the Shoels also intended to settle. Indeed, there was no hint of a division between the Shoels and their counsel in the proceedings below. Thus, there was a sufficient basis in the record for the district court's finding that the Shoels, through counsel, accepted the Harris/Klebold offer.

But even if we were not convinced of this, it would be improper to reverse the district court on this ground, because the Shoels never properly presented their lack-of-authority claim to that court. When pressed at oral argument, Mr. Fieger stated that he did raise the claim, and cited several pages of the transcript where he testified that the Shoels consistently refused to settle without knowing the dollar amount they would receive. But even though Mr. Fieger's testimony about the Shoels' refusal to consent could conceivably have provided a factual basis for the legal claim he now raises, that is not enough; a party must also present the legal basis of the claim to the district court clearly and explicitly. *See N. Natural Gas Co. v. Hegler*, 818 F.2d 730, 734 (10th Cir. 1987) (refusing to consider a legal claim suggested by the evidence but not argued below); *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993) (stating that "vague, arguable references to [a] point in the district court proceedings do not . . . preserve the issue on appeal") (quoting *Monarch Life Ins. Co. v. Elam*, 918 F.2d 201, 203 (D.C. Cir. 1990) (brackets and ellipses in original)). Nowhere in the briefing or argument did Mr. Fieger argue that he lacked authority or cite any cases raising the issue of an attorney's authority to settle on behalf of a client. His theory was not that he had settled the case without the Shoels' permission; rather, his theory was that neither he nor the Shoels settled or intended to settle. The general rule in this circuit is that "a party may not lose in the district court on one theory of

the case, and then prevail on appeal on a different theory." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 999 (10th Cir. 2002) (quoting *Lyons*, 994 F.2d at 721).

Of course, we do have discretion to make exceptions in extraordinary circumstances, and as Appellants note, we are more willing to exercise that discretion when the newly raised issue is primarily a legal one. *See, e.g.*, *Petrini v. Howard*, 918 F.2d 1482, 1483 n.4 (10th Cir. 1990) ("A federal appellate court is justified in reversing a judgment on the basis of issues not raised below when, as here, the issues involved are questions of law, the proper resolution of which [is] beyond reasonable doubt, and the failure to address the issues would result in a miscarriage of justice."). But because the question of Mr. Fieger's authority is essentially factual, it would be inappropriate to make an exception in this case. Had this issue been properly raised below, both sides could have presented evidence (including, perhaps, the crucial testimony of Mr. and Mrs. Shoels) about what the Shoels knew and what they authorized, rather than focusing on Mr. Fieger's intent to settle (which is irrelevant if he lacked authority to settle in the first place). When a fact question is not squarely presented to the finder of fact and the adverse party, it would be unfair to allow an appellant to prevail simply because the evidence accidentally adduced on that question tips in the appellant's favor. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) (explaining that appellate

courts should generally decline to reach newly argued issues so that "litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence"). That is doubly true when an appellant wishes to argue that the acts of an attorney are not imputable to his client, as they are generally presumed to be.

II

Next, the Shoels argue that the April 19 letter could not have created a binding contract because the terms of the proposed settlement were still too vague. They claim that at most, their agreement was a nonbinding agreement in principle, subject to further negotiations. In Colorado, whether negotiations are sufficiently definite and final to create a binding contract is to be decided by the finder of fact. *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1986) (en banc). The district court determined that there was a binding contract, and the record supports its finding. Mr. Wahlberg's April 16 letter, as well as his subsequent telephone conversations with the Shoels' counsel, laid out the terms of the Klebolds' and Harrises' offer in detail, explaining exactly how much they were offering, how a portion of that amount would be held in reserve to cover the Rouse group's claims, and how the remainder would be distributed among the settling plaintiffs. Mr. Fieger's reply letter was no less definite, stating in categorical terms that the Shoels had approved settlement. It contained

-18-

no language suggesting that their approval was provisional or "tentative" (as Mr. Raymond tried to describe it the next day). The context of that letter also suggests that it was meant to be binding. The Shoels had been "participating" without committing to the arbitration process for quite some time. As the district court noted, the question on April 19 was whether they would finally commit so that the settlement, as set forth in the April 16 letter, could be finalized. And if the content and context of the letter were not enough to show that the parties meant to enter a binding agreement, we have local counsel's own insistence, just one day after the April 19 letter, that the Shoels' attorneys "were not surprised that there was a settlement." App. 180.

Despite this evidence, Appellants contend that the district court's finding was clear error. They stress the fact that at the time of their alleged acceptance, there was no way they could know how much they would get out of the settlement. This, they claim, makes their case analogous to Colorado cases in which an agreement was held unenforceable. *See, e.g.*, *Griffin v. Griffin*, 699 P.2d 407 (Colo. 1984) (en banc); *Difrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1250 (Colo. Ct. App. 2001). But these cases involved very different facts. In *Griffin*, a husband and wife had agreed as part of a divorce settlement that they would reach a joint agreement about where their daughter would go to school. When they were unable to reach such an agreement, the mother (who had

-19-

custody of the child and thus the legal right to choose her school) chose a school over the father's objection. The Colorado Supreme Court held that because the parties' separation agreement "made no provision for the resolution of disagreement concerning the selection of schools," and because the court could not force the parents to agree on a school, it could not enforce the agreement. *Griffin*, 699 P.2d at 409. Similarly, *Difrancesco* involved a license agreement that not only left essential terms like the royalty rate and license scope unspecified, but also failed to specify any method by which these terms could later be determined. 39 P.3d at 1250. The lack of such a method brought those cases within the firmly settled Colorado rule that "[i]f essentials are unsettled, *and no method of settlement is agreed upon*, there is no contract." *Greater Serv. Homebuilders' Inv. Ass'n v. Albright*, 293 P. 345, 348 (Colo. 1930) (en banc) (emphasis added).

In stark contrast to these cases, the settlement agreement set forth in the April 16 letter (which is what the plaintiffs accepted on April 19) provided a method for fixing a definite value for the Shoels' claims: a neutral arbiter, Judge Carrigan, would determine their value. In such circumstances, it is irrelevant that the value of the claims was difficult to predict in advance; otherwise, every futures contract would be void in Colorado. Once Appellants knew how much money the Klebolds and Harrises were offering to make available, and that those

funds would be distributed according to the relative value of each plaintiff's claims as determined by Judge Carrigan, the arrangement was sufficiently specific to constitute an enforceable contract.

Appellants can also be understood to raise a closely related, but conceptually separable, argument. It is that even if the terms were specific enough to be enforceable, still Appellants' correspondence was meant merely to state tentative approval, not final agreement. Under Colorado law, an acceptance conditioned on reaching a later, more detailed agreement is not binding. *Difrancesco*, 39 P.3d at 1248. Moreover, correspondence during the course of negotiations is often best construed as being conditioned in this way. *Pierce v. Marland Oil Co.*, 278 P. 804, 806 (Colo. 1929) (in dep't). However, though some evidence in the record supports this interpretation of the April 19 acceptance, it is insufficient to disturb the district court's factual finding.

First, Appellants note that the April 19 letter purported to approve settlement with Robyn Anderson, and since it is undisputed that she had not yet offered a particular amount in settlement, they argue that the April 19 "approval" of settlement with her could not have been meant as a binding acceptance. They then infer that the letter's approval could not have been meant as a binding acceptance of the other defendants' offers, either. That is one possible interpretation of the letter. Another possibility is that Mr. Fieger's April 19

reference to Robyn Anderson was a simple mistake and was therefore irrelevant to the effect of the letter with respect to the valid offers. At the time, Mr. Wahlberg interpreted the approval letter in yet a third way: in his view, the letter did not operate directly as an acceptance of the various settlement offers; rather, by "approv[ing] settlement," it gave Mr. Wahlberg authorization to settle on behalf of the Shoels. In the aftermath of Mr. Fieger's disavowal of his April 19 letter with respect to the Klebolds and Harrises, Mr. Wahlberg reaffirmed his understanding that Mr. Fieger's letter had given him authority to settle the Shoels' claims against Anderson, Duran, and Manes, and Mr. Fieger's subsequent correspondence appeared to concede that point. If Mr. Wahlberg's interpretation was correct, it would not matter that Anderson's claims were not settled for another week or so. On that interpretation, the April 19 letter gave Mr. Wahlberg authority to settle the various claims; he exercised that authority immediately with respect to the Klebolds and Harrises but only later with respect to Anderson. Thus, even if we reject the district court's simpler view that the April 19 letter was an acceptance, we still find ample record support for its ultimate factual conclusion that a binding agreement was formed that day.

Second, Appellants rely on the fact that the Shoels never released their claims by signing the official arbitration agreement itself. Appellants suggest that signing the release form was a condition precedent to the existence of a valid

-22-

agreement. In part, this contention seems to be based on a conflation of conditions precedent to the *agreement* and conditions precedent to the Klebolds' and Harrises' *performance*. While it is true that no funds were to be disbursed until the releases were signed, it does not follow that no contract existed until that time. Appellants also rely on language from section IV(B) of the Judicial Arbiter Group's arbitration agreement, which states that "[b]y signing this Agreement . . . the Claimant is agreeing to be bound by the distribution as awarded by the Arbiter." App. 198. They claim that this language makes signing a necessary precondition to being bound. But while it does appear that the agreement contemplated acceptance by signing, the quoted language does not imply that signing the agreement was the *only* way to accept. Its true effect is to set forth one of the consequences of entering the agreement (namely, becoming bound by the arbitration), not to limit the means by which the agreement might be entered.

Finally, there is the text of the claimants' joint acceptance letter itself. Some of its language does seem provisional:

> Further, the statute of limitations shall be tolled for 30 days from April 20 for anyone participating in the proceedings before Judge Carrigan so that we *may prepare a mutually acceptable settlement agreement*.

App. 159 (emphasis added). This language, while relevant, is not dispositive. While the letter clearly contemplates working out a more detailed agreement,

-23-

nowhere does it state that the existence of a binding contract is conditioned on successfully completing that process. "'[T]he mere intention to reduce an oral or informal agreement to writing, or to a more formal writing, is not of itself sufficient to show that the parties intended that until such formal writing was executed the parol or informal contract should be without binding force.'" *Rocky Mountain Airways*, 713 P.2d at 888, *quoting Coulter v. Anderson*, 357 P.2d 76, 80 (Colo. 1960) (in dep't). It may be possible to interpret Mr. Wahlberg's language as saying that there was no binding agreement on April 19, and if such an agreement were not formulated within thirty days, the plaintiffs would remain free to bring suit. But it is also possible that the plaintiffs did consider themselves bound, but required the statute of limitations to be tolled so that they would still be able to bring suit in the event that the defendants breached the agreement to deposit their funds in escrow. *See Goltl v. Cummings*, 380 P.2d 556, 558-59 (Colo. 1963) (in dep't) (finding that a settlement agreement existed in similar circumstances). Given the non-tentative beginning of Mr. Wahlberg's letter ("The purpose of this letter is to accept the settlement proposal . . . ."), on balance it, too, supports the district court's conclusion. And whatever ambiguities may be read into the text now, the district court rightly resolved those ambiguities in light of Mr. Raymond's contemporaneous admission that the parties understood the April 19 settlement to be final. Op. 9; *see* App. 180. Thus, whether Mr. Fieger's

-24-

letter was itself meant as an acceptance, or whether it was meant to authorize Mr. Wahlberg to settle on behalf of the Shoels, the district court's determination that there was a binding acceptance has ample record support.

Appellants cite in their favor *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405 (10th Cir. 1996), in which this Court applied Colorado law to hold a note purchase agreement unenforceable. However, the purported agreement in that case was marked by its use of the conditional tense to describe what "would be" the case if the deal were consummated, and unlike Mr. Wahlberg's letter, it specifically stated that the deal would not be consummated until the parties reached "final agreement upon terms, conditions, covenants and other provisions satisfactory to Prudential." *Id.* at 411. Those facts alone suffice to distinguish *K N Energy*. In addition, *K N Energy* is of limited relevance here, because it did not squarely decide whether a contract existed. Instead, because several conditions precedent to the actual note purchase had not been fulfilled, the panel held that the purported agreement was *either* "an [unenforceable] agreement to agree *or* a contract subject to conditions precedent which were never fulfilled." *Id.* (emphasis added). The Shoels have not shown that the Harrises and Klebolds have failed to perform any act on which the Shoels' obligation to release their claims was conditioned. Rather, the Harrises and Klebolds have deposited their funds as required, and now demand that the Shoels fulfill their part of the bargain.

-25-

Appellants' final argument is that they should not be held to the contract because their acceptance was predicated on either a mistake or a misrepresentation. In particular, they assert that in the discussions and correspondence immediately prior to Mr. Fieger's acceptance, Mr. Wahlberg told local counsel that "everybody is on board except the Shoels," App. 202, 217, and "everyone else has signed the agreement," App. 194, falsely leading the Shoels and their counsel to believe that the Rouse plaintiffs had reconsidered their refusal to settle with the Klebolds and Harrises. This is not a newly argued objection to the alleged settlement. As we have already noted, just one day after Mr. Fieger's acceptance, Mr. Raymond wrote to Mr. Wahlberg: "[W]e were not shocked that there was a settlement. We were shocked that there was a settlement that did not include Rouse's group as to Klebold and Harris." App. 180.

The district court found that because it had been well-established since at least March of 2001 that the Rouse group was refusing to settle with the Klebolds and Harrises, Mr. Wahlberg's statements that "everyone else" had signed the agreement could not reasonably be interpreted to mean that the Rouse plaintiffs had changed their minds. Rather, the only reasonable interpretation was that "all of the claimants who previously had indicated a willingness to participate in arbitration had signed the agreement." Op. 10. Thus, the Court concluded that

"the Shoels cannot reasonably claim that they accepted the terms of the arbitration agreement based on the erroneous assumption that the Rouse group was also participating." Op. 10-11.

The ultimate question here, therefore, is whether their counsel's unreasonable misunderstanding of Mr. Wahlberg's statements allows the Shoels to avoid their agreement. Because there is no hint in the record that the Klebolds and Harrises shared Appellants' mistake, that question seems easily resolved by the venerable principle that a unilateral mistake of one party to an agreement is not ground for rescision. *Royal v. Colorado State Personnel Bd.*, 690 P.2d 253, 255 (Colo. Ct. App. 1984) ("What Royal may have understood or contemplated is not relevant. A unilateral mistake or mistake of law, if any, is not a ground for setting aside an agreement."); *In re Marriage of Manzo*, 659 P.2d 669, 672 (Colo. 1983) (en banc) ("[T]raditionally a contract may not be rescinded because one party has made a unilateral mistake as to value unless the other party knew or had reason to know of the error."); *Kuper v. Scroggins*, 257 P.2d 412, 413 (Colo. 1953) (en banc) ("In order to avoid a contract on the ground of mistake, it must be a mutual mistake."). The Shoels, however, propound three reasons why that principle does not dispose of the case. First, they rely on an equally hoary principle of the law of contracts: that there must be a meeting of the minds on all material points before a contract exists. Second, they argue that the rule against

-27-

granting rescission based on unilateral mistakes is not as absolute as it is sometimes expressed, and the equities favor setting aside the agreement in their case. Third, they note that courts have traditionally applied more lenient standards when one party's mistake is the result of misrepresentation or fraud, and at least the former is alleged here. For the reasons explained below, however, none of these doctrinal wrinkles persuades us that the Colorado Supreme Court would excuse the Shoels' unilateral mistake in this case.

A

Although one party's mistake about the facts relevant to an agreement is not normally grounds for rescission, the same is not true if the "mistake" goes to a material term of the agreement itself. When the language of a contract contains a latent ambiguity and one of the parties is in fact assenting to something different from what the other party agrees to, the upshot of that "mistake" is that there was never a meeting of the minds as to a material term of the contract, and consequently there was never any contract at all. The textbook example of this principle is *Raffles v. Wichelhaus* 159 Eng. Rep. 375 (Ex. 1864), where the parties agreed to the sale of goods aboard a ship called *Peerless*, but were in fact referring to two different ships by that name.

That principle is inapplicable here. The Shoels' lawyers' mistake regarding whether the Rouse group was participating in the settlement at most affected their

assessment of the value of their claim or the desirability of entering the settlement. It did not create any ambiguity regarding the terms or substance of the settlement agreement. Under that settlement, the Shoels agreed to release their claims in return for the Klebolds contributing $1,568,000 into a fund that would be divided up in arbitration. The rights and obligations on both sides were the same, whether or not the Rouse group was participating. We therefore reject Appellants' contention that there was no meeting of the minds because of their misunderstanding about the Rouse group.

B

Appellants argue that even if their mistake was unilateral, equity nevertheless favors voiding the contract because the Harrises and Klebolds did not rely on their acceptance before it was revoked. They cite in their favor *Powder Horn Constructors, Inc. v. City of Florence*, 754 P.2d 356 (Colo. 1988) (en banc). In that case, a contractor's bid on a city construction project erroneously omitted certain expenses and thus was substantially lower than the other bids. Before the city had accepted any of the bids, the contractor noticed the mistake, informed the city, and submitted a corrected bid. Thereafter, the city accepted the original bid. Noting that "[n]o contract for construction of the project was ever executed by the parties, and there was no delay, no surprise, and no justifiable reliance by the City," the Colorado Supreme Court held that the

contractor was entitled to withdraw its bid, even though such bids are generally irrevocable. *Powder Horn*, 754 P.2d at 361. Furthermore, the court refused to require a showing that the contractor had not been negligent, holding that material clerical errors (as opposed to errors in judgment) justify withdrawing a bid so long as the bid was made in good faith and the public authority did not rely on the bid to its detriment. *Id.* at 363.

However, the *Powder Horn* court refused to rely solely on the absence of detrimental reliance by the city. The court noted no fewer than five times that its holding extended only to cases in which the bid was withdrawn prior to formation of a contract. *See id.* at 359, 360, 361, 363, 364. It also relied on the fact that the city knew about the mistake prior to accepting the erroneous bid. *See id.* at 363-64. In the Shoels' case, by contrast, the unilateral mistake was by the party who accepted the contract, and so the attempted withdrawal did not occur until after a contract had been formed.

This distinction is rooted in the idea that parties can make promises to each other that are binding well in advance of performance or detrimental reliance. The moment that each party has given up some consideration in return for the other party's performance, each becomes entitled to the bargained-for performance, and if the other party declares a moment later that it will not perform, the measure of damages will be relative to the parties' expectations of

full performance, not their reliance damages.  As the Colorado Supreme Court noted in *Powder Horn* , one of the "basic policies underlying the enforcement of contracts" is the protection of those legitimate expectations.  *Id.* at 364.

In the public bid context in which  *Powder Horn*  was decided, bids are irrevocable upon opening in order to "protect the integrity of the bidding process," *id.* at 360, not to protect bargained-for expectations.  For in the typical case, a city has not given up anything in exchange for the lowest bidder's performance when it first opens the bids.  It remains free to select another contractor or to reject all of the bids and cancel the project.  Outside of the bidding context, general principles of contract law preserve symmetry between the offeror and offeree by making the offeror just as free to withdraw the offer as the offeree is to reject it.  Thus, it was quite reasonable for the Colorado Supreme Court to hold that equity favored the mistaken offeror over the city's desire to reap a "windfall profit" for which it had given up nothing.  *Id.* at 364.  This case, though, involves an attempt to revoke an acceptance, not an offer.  That difference is significant because unlike the city in  *Powder Horn* , the Klebolds and Harrises lost their freedom to renegotiate the moment the Shoels made their "mistake" and accepted the settlement.  Thus, although it is true that the Klebolds and Harrises had not relied on the contract before the Shoels' counsel repudiated it, Mr. Fieger's acceptance letter materially changed their position by committing

-31-

them to stand by their offer.  Having committed to pay almost $1.6 million to settle all of the claims against them, including the Shoels' claims, the Klebolds and Harrises were entitled to the release of those claims.

Appellants also rely on the Second Restatement of Contracts, which does allow unilateral mistake to void a contract under certain circumstances.  Even the Restatement, though, does not allow relief when doing so would frustrate the legitimate contract-based expectations of innocent parties.  *Powder Horn*, 754 P.2d at 364 n.7.  Rather, it allows relief only if the mistakenly entered contract was unconscionable or the defendant knew or had reason to know of the mistake, thus casting doubt on the legitimacy of the defendant's expectations.  *Restatement (Second) of Contracts*  § 153; *Powder Horn*, 754 P.2d at 364 (noting that "equity will not allow a party to knowingly take advantage of a mistake of another").

If the Klebolds and Harrises, like the sharp-dealing city in  *Powder Horn*, had known of Appellants' mistake, we would have to decide how the Colorado Supreme Court would apply  *Powder Horn*'s analysis in the context of a fully-formed contract.  But the Klebolds and Harrises, who were not party to the discussions between Mr. Wahlberg and counsel for the Shoels, had no way of knowing about the miscommunication about the Rouse group's participation when the contract was formed.  Rather, they were just the kind of innocently contracting parties whose protection the Colorado Supreme Court considers to be

of fundamental importance to the law of contracts. *See Powder Horn*, 754 P.2d at 364. We therefore reject the argument that Appellants should have been permitted to withdraw from the settlement agreement because of their unilateral mistake.

C

Finally, Appellants argue that they accepted the settlement not merely because of their own confusion, but rather because Mr. Wahlberg affirmatively (though, they concede, innocently) misrepresented the status of the Rouse group. Under Colorado law, rescission based on misrepresentation is both easier and harder to obtain than rescission based on unilateral mistake. On the one hand, Colorado law allows rescission of an acceptance based on a material misrepresentation even after the contract is formed, and even if the other party did not knowingly or unconscionably take advantage of the resulting misapprehension. *See Wall v. Foster Petroleum Corp.*, 791 P.2d 1148, 1150 (Colo. Ct. App. 1989); *Bassford v. Cook*, 380 P.2d 907, 910 (Colo. 1963) (in dep't); *Wheeler v. Dunn*, 22 P. 827, 833 (Colo. 1889) (setting forth the requirements for equitable rescission based on misrepresentation); *see also Restatement (Second) of Contracts* § 164(2). But on the other hand, while *Powder Horn* allowed the withdrawal of a bid even based on negligent mistakes so long as they were made in good faith, 754 P.2d at 363, it is "well settled" that

-33-

plaintiffs must show that their reliance on a material misrepresentation was justified. *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1383 (Colo. 1994) (en banc). Thus, the contract is voidable on this ground only if Mr. Wahlberg's statement was a material misrepresentation on which the Shoels were justified in relying.

Appellants fail to establish that it was. First, it is far from clear – in light of the district court's factual findings – that Mr. Wahlberg's statement that "everyone is on board," App. 202, was a misrepresentation at all. In context, according to the district court, this statement could only be reasonably interpreted to refer to those parties engaged in negotiations, which (with respect to the Klebolds and Harrises) did not include the Rouse group. Mr. Wahlberg was simply informing Appellants that they were the last claimants whose assent was necessary to finalize the various settlements.

Even assuming the statement could be regarded as a misrepresentation, Appellants make no showing that it was material. Whether or not the Rouse plaintiffs participated, the arbiter would determine the Shoels' portion of the insurance proceeds by calculating the ratio of their damages to the total of all damages (including the Rouse group's damages). Either way, the Shoels' likely share of the proceeds would have remained roughly the same, and might even have been larger if the Rouse group did not participate (since the agreement was

-34-

that funds set aside but not ultimately used to defend particular claims would eventually be distributed among the settling claimants).

Nor have Appellants established that they were justified in relying on Mr. Wahlberg's misrepresentation (if it can be called that). Under Colorado law, reliance on a misrepresentation is unjustified if the context obviously calls its accuracy into question or suggests that further investigation is necessary. *See, e.g.*, *Mortimer*, 866 P.2d at 1381-82 (plaintiffs were not justified in relying on a verbal misrepresentation about the location of a proposed highway; because a prominently displayed map showed the correct location, plaintiffs had a duty to inquire further); *Bassford*, 380 P.2d at 909-10 (buyers were not justified in relying on arguably inaccurate explanations for cracks in the walls of a house when the seller had given them the contact information of the engineer who could explain the problem in more detail). Mr. Wahlberg suggested that "everyone else" had agreed to settle on two different occasions: both in an April 13 letter, and then again in the April 18 telephone conversation. App. 194, 202, 217. But in the interim, his April 16 letter setting forth the final contours of the settlement painstakingly explained that the Klebolds and Harrises would be withholding from the settlement proceeds the portion of funds attributable to the Rouse group and other nonsettling claimants. App. 606. The April 16 letter, together with the Rouse group's long refusal to settle with the Harrises and Klebolds, supports the

district court's finding that it was unreasonable for Appellants to rely on Mr. Wahlberg's statement to conclude that the Rouse group had changed its position. Even were we to disagree with that finding, under Colorado law we would be bound to defer to the district court's assessment on this point. *See Mortimer*, 866 P.2d at 1382. Misunderstanding, not misrepresentation, was the basis for Appellants' acceptance, and so they cannot evade the normal limitations on relief from the consequences of their mistake.

## CONCLUSION

For the reasons discussed above, the decision of the district court is AFFIRMED.