UNITED STATES COURT OF APPEALS

**January 13, 2011**

FOR THE TENTH CIRCUIT

GET, LLC, d/b/a Get Real Cable,

   Plaintiff-Appellant,

v.

CITY OF BLACKWELL,

   Defendant-Appellee.

No. 10-6068
(D.C. No. 5:08-CV-00623-R)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **EBEL**, and **O'BRIEN**, Circuit Judges.

Plaintiff GET, LLC (GET), a cable operator, commenced this action asserting various federal and state law claims when negotiations over the renewal of its cable franchise with the defendant City of Blackwell broke down. But this appeal by GET is not about the merits of these claims. Rather, this appeal concerns the parties' efforts to settle the case. Specifically, GET challenges the

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

district court's determination that the parties had reached a binding settlement of the action, encompassing both a settlement agreement and an associated franchise agreement, and asks us to reverse the district court's resultant order enforcing the agreements and dismissing the case.

"A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it." *Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004) (internal quotation marks omitted). Where, as here, the formation of a purported settlement agreement is at issue, we look to state contract law to resolve the matter. *Id.* In Oklahoma, the existence of a contract, and in particular "whether the minds of the parties ever met in complete agreement," is a question of fact. *Gomes v. Hameed*, 184 P.3d 479, 485 (Okla. 2008); *see also Manchester Pipeline Corp. v. Peoples Natural Gas Co.*, 862 F.2d 1439, 1445 (10th Cir. 1988). Thus, although our overarching standard of review is for abuse of discretion, *see Shoels*, 375 F.3d at 1060, we review the critical finding at issue in this appeal, that the parties reached a binding settlement of the case, for clear error, *see, e.g.*, *id.* at 1056; *United States v. McCall*, 235 F.3d 1211, 1215 (10th Cir. 2000). *See generally United States v. Hasan*, 609 F.3d 1121, 1127 (10th Cir. 2010) (noting abuse-of-discretion review incorporates clear-error standard for fact findings). As explained below, we hold that the district court's finding was not clearly erroneous and hence affirm its

enforcement order.[1]  We also agree with the district court that GET waived any argument under the statute of frauds.

## I.  SETTLEMENT EFFORTS AND ASSOCIATED PROCEEDINGS

At the center of this appeal are the parties' negotiations over a new franchise agreement that would obviate further litigation of their dispute.  The district court found that in the course of these negotiations the parties reached agreement on all material terms, which is the *sine qua non* of a binding contract, *Watkins v. Grady County Soil & Water Conservation Dist.*, 438 P.2d 491, 494 (Okla. 1968) ("It is elementary that there must be a meeting of the minds of the

---

[1]     As the cases cited above reflect, the disputed existence of a contract, like other fact questions, is generally reserved for the jury.  *Gomes*, 184 P.3d at 485; *Manchester Pipeline Corp.*, 862 F.2d at 1445.  In Oklahoma, this appears to be true even if the contract involves a settlement of the litigation before the court. *See In re De-Annexation of Certain Real Property from the City of Seminole*, 204 P.3d 87, 89 (Okla. 2009).  This latter aspect of Oklahoma law does not control here.  Even in diversity cases, where state substantive law controls, "[f]ederal law generally governs the allocation of tasks between the court and the jury."  *MidAm. Fed. Sav. & Loan Ass'n v. Shearson/American Express, Inc.*, 962 F.2d 1470, 1475 (10th Cir. 1992); *see, e.g., Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 573 (6th Cir. 2008); *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1416 (4th Cir. 1992).  And adherence to federally assigned roles for judge and jury is obviously even more compelling in non-diversity cases.  *In re Lewis*, 845 F.2d 624, 628 (6th Cir. 1988).  Our cases consistently illustrate that the federal district court resolves disputed issues relating to the existence and enforcement of agreements settling pending litigation, even when factual findings are required.  *See, e.g., Shoels*, 375 F.3d at 1056 (affirming order finding and enforcing settlement agreement on strength of district court's factual findings); *United States v. Hardage*, 982 F.2d 1491, 1496-97 (10th Cir. 1993) (remanding for district court to hold evidentiary hearing to resolve factual dispute over existence of valid settlement agreement).

parties on all material parts of the agreement in order to settle a valid contract.");
*Roads West, Inc. v. Austin*, 91 P.3d 81, 85 (Okla. Civ. App. 2003) (same); *see also Holleyman v. Holleyman*, 78 P.3d 921, 935 n.37 (Okla. 2003) (stating contract is not invalid simply because it does not specify all details regarding the subject matter, so long as parties' intent can be ascertained with reasonable degree of certainty). Specifically, the district court found that the parties had reached a binding settlement based on the terms in a draft franchise agreement dated June 16, 2009, approved by the City Council on June 17, 2009, revised as to form by draft dated July 1, 2009, and further corrected by the court to reflect certain matters previously agreed upon but inaccurately captured by the language of the draft. GET contends that the parties never reached an agreement and that the district court, in effect, "impermissibly composed a settlement agreement for the parties by supplying terms on which there had been no final agreement," *In re De-Annexation of Certain Real Property from City of Seminole*, 204 P.3d 87, 93 (Okla. 2009). Before we address the specific arguments advanced by GET, it will be necessary to recount the parties' communications to each other and to the court during the course of settlement negotiations. Additional points regarding relevant testimony and documentary evidence will be included later where necessary in our analysis of the issues presented for our review.

During the spring of 2009, counsel for the City, primarily Robert Jernigan at the time, and counsel for GET, Kaiser Wahab, engaged in informal settlement

-4-

negotiations, working from an initial draft franchise agreement prepared by Jernigan. In the time leading up to a settlement conference set for June 9, 2009, counsel identified several key terms for resolution, including the franchise fee to be paid by GET on its revenue (both the fee percentage and the types of revenue to which the percentage would be applied), the term of the franchise, the "pole fee" to be paid by GET (a charge for use of poles to which cable lines are attached), GET's imposition of a monthly five-dollar "litigation fee" charge on subscribers, eminent domain concerns, and the scope of the settlement (whether it would encompass GET's interest in another legal proceeding pending before the Oklahoma Supreme Court).

Magistrate Judge Argo presided over the settlement conference. Counsel actively participated in the conference, but the parties were also present to confer with counsel. The City Manager, Mayor, and one council member attended for the City, which was legally represented by Jernigan, David Lee, Mary Karns, and Johnson Woods, while Gregg Deffner, managing member of GET, and Jessica Pepper attended for GET, which was legally represented by Wahab and Jim Buxton. As established by later testimony of the participants, and memorialized to some extent in handwritten notes made by Karns on Jernigan's initial draft agreement, an oral understanding addressing the key unresolved terms was reached. Basically, the franchise fee would be 3.5% of gross revenue (down from the City's initial demand of 5%), which at GET's insistence was not to include

revenue from internet operations as distinguished from cable services; the term of the franchise would be ten years (up from the City's initial limit of five years); the pole fee would be $3.50 per pole (though this would have to be set out in a separate pole attachment agreement with the Blackwell Utility Authority); a provision expressly preserving the City's right to lawful exercise of its police powers (eminent domain) was to be eliminated; GET would immediately stop charging subscribers the $5 litigation fee; and GET would dismiss the instant action in its entirety, though it would not be required to abandon other ongoing litigation. Counsel informed Magistrate Judge Argo that they had a tentative agreement to settle, that they would work out the remaining details and prepare a written draft for approval by the City Council within a few days, and that they would inform the magistrate judge of the result.

On June 15, 2009, Karns took a copy of a revised draft worked up by Jernigan and Wahab to the City Council. On her way there, she received word from Wahab that GET manager Deffner wanted to reduce the amount and duration of the security fund required by the City. Because these were material changes to what had been agreed upon in the existing draft, Karns told him that the City would not likely approve them. Two days later, on June 17, the City Council approved the agreement, without the changes to the security fund provision, subject to it being finalized and enforced by court order, at which point the Council would give the agreement effect as a city ordinance.

Work to complete a polished document was continued the next day. Karns sent an email to Wahab enclosing a copy of the draft approved by the City Council, noting that it still needed formalistic corrections such as punctuation and capitalization, but expressing a wish to wrap up the matter quickly. She also had a question about some language used in an indemnification provision that Wahab had written. When Wahab explained that he and Jernigan had agreed on the language, Karns responded that she had no intention of interfering with prior negotiations. On June 19, 2009, Wahab stated that aside from the indemnification section and a question about termination of the franchise (which he explained at the hearing had to do with correcting the term of the pole attachment agreement to match the ten-year term agreed upon for the franchise itself), "I think we are good to go." Aplt. Addendum at 228. Three days later, on the following Monday morning, Wahab followed up with an email stating: "Please let me know what you need from me and how we're doing on the agreements (last I checked we were pretty much done)." *Id.* at 230. The next day, June 23, he sent an email to Lee, Jernigan, and Karns stating: "I believe we are near completion on the subject franchise agreements, but I am awaiting final docs from the City so that I can go over them with my client and secure his OK for settlement." *Id.* at 49.

In the meantime, nothing had been communicated to Magistrate Judge Argo since the settlement conference two weeks earlier. On June 23, sometime after Wahab sent the email noted above, the magistrate judge sent an email to Lee and

to Wahab and Buxton asking: "Could you please update me on the status of the tentative settlement?" *Id.* at 50. Lee conferred with Wahab about the email and then telephoned the magistrate judge to tell him that the parties were prepared for entry of an administrative closure order halting further proceedings in the case. Magistrate Judge Argo later testified that, although he did not remember the exact wording used, the parties certainly communicated to him that the case had settled, and he entered a brief order to that effect. The district court promptly followed up with an Administrative Closing Order, which stated:

> *On the representations from counsel for both sides that the parties have reached a settlement and compromise*, it is ordered that the Clerk administratively terminate this action in his records without prejudice to the rights of the parties to reopen the proceeding for good cause shown, for the entry of any stipulation or order, or for any other purpose required to obtain a final determination of the litigation.
>
> If the parties have not reopened the case within 30 days of this date for the purpose of dismissal pursuant to the settlement compromise, Plaintiff's action shall be deemed to be dismissed.

Admin. Closing Order dated June 24, 2009 (emphasis added). Neither party made any objection to these orders.

The next day, Wahab sent the following email to Jernigan and Karns:

> Please let me know when I can get a final to send over to my client for review. I explained to him that there is little to no room for changes. However, I cannot guarantee that he will not ask for minor changes that might be mutually acceptable and the faster I have that final the fast[er] we can close things out. Many thanks.

Aplt. Addendum at 51.  A week later, on July 1, Karns sent an email to both Jernigan and Wahab attaching a draft and apologizing for her delay.  She noted several changes she had made per their directions, including removal of the eminent domain provision and addition of a force majeure definition Wahab had prepared, though she conceded that she still "probably missed something."  *Id.* at 231.  The email concluded with the following comments about finalization of the franchise agreement and conclusion of settlement:  "I am sure, Kaiser [Wahab], that you cannot get this worked out with Greg [Deffner] in time for us to do this Monday [July 6], and we need to all review the settlement agreement anyway, but we can either do this the 20th, or I will have my guys call a special meeting."  *Id.*

On July 13, 2009, counsel's optimism about finalizing the franchise agreement evaporated when Wahab sent Karns a re-revised draft with many major and minor changes.  *See id.* at 132 (email), 91-129 (re-revised draft agreement).  Some of these were in line with agreed-upon terms that the existing draft simply failed to reflect, such as removal of the reference to internet services in the definition of gross revenues, *see id.* at 94, and removal of language–left over from an early draft that had set the franchise fee at the then legal maximum of 5%–that would have enabled the City to raise the franchise fee above the agreed upon 3.5% in the event the legal maximum were increased, *see id.* at 97.  But many changes reflected new demands.  Wahab asked for Karns's "gut" assessment of

whether the City was likely to accept any, most, or all of the changes. She

promptly responded with an email that stated in pertinent part:

> Kaiser, my "gut" reaction is that some of these proposals are going to send my client through the roof. There are a handful that may be OK, but the ones that appear to be most important to your client are not going to fly. They [City officials] are going to want to change some things they are not happy to have agreed to, and we will be back at square one.
>
> I have circulated this to Bob [Jernigan] for his comments and we will respond to you tomorrow probably. . . .
>
> David [Lee] is going to send you a draft settlement agreement, so we at least know where we are on that.
>
> . . . .
>
> [M]y "gut" tells me what I have believed all along: the parties will not be able to reach an agreement, despite the best efforts of attorneys and some of the participants.
>
> I will work with Bob and see if there is anything we believe we can agree to or recommend, but other than the grammatical type errors, I do not see anything changing from our side.

*Id.* at 131.

Two days later, on July 15, Lee sent Wahab a letter enclosing a five-page

draft settlement agreement. *See id.* at 133-38. The letter also commented on the

recent impasse with respect to the franchise agreement, stating in no uncertain

terms Lee's view that GET was taking the matter in a direction contrary to the

parties' prior agreement to settle that he had communicated to Magistrate Judge

Argo:

-10-

Enclosed is a draft of Settlement Agreement and Full and Final Mutual Release of Claims. Obviously before the City will sign and enter into this Agreement, Mr. Deffner and GET must agree to the Cable Franchise Agreement negotiated between you, Mr. Jernigan, and Ms. Karns. As the Administrative Closing Order is due to expire on July 24, 2009, please finalize the Franchise Agreement so that we can enter into this Settlement Agreement.

As you know, we had previously advised Magistrate Judge Argo that the case had settled. If it comes to this, I will have no hesitation in filing a motion to enforce settlement agreement and file a motion for sanctions against Mr. Deffner if he attempts to breach our agreement that the case had settled.

*Id.* at 133.

While the draft settlement agreement generally followed the understanding reached at the June 9 settlement conference, it diverged from that accord in two specific ways, as Wahab explained in uncontroverted testimony at the evidentiary hearing. First, in addition to releasing all claims in the instant action, the draft agreement required GET and Deffner to drop all pending litigation with the City, however unrelated, including an unresolved legal action involving an initiative petition. *See* Aplt. Addendum at 135; Aplt. App. at 835-36. But after Wahab objected to this language, Lee promptly removed it. *See* Aplt. App. at 836, 840; Aplt. Addendum at 140, 141. Second, the draft prohibited Deffner from "seek[ing] another cable television franchise on his own behalf, or on behalf of any corporation or other entity in which he has any monetary or legal interest." Aplt. Addendum at 134. This prohibition had never been a part of the parties' agreement. *See* Aplt. App. at 836-39. In his brief closing argument at the

hearing, Lee stated "for the record" that he would "withdraw that clause from [the City's] motion to enforce the settlement agreement." *Id.* at 863.

Two letters exchanged between Wahab and Lee set out their differing views of the critical communication to Magistrate Judge Argo on June 24 that prompted the magistrate judge and the district court judge to issue the orders noted above reciting that the case had settled. Wahab insisted that the communication had done nothing more than authorize an administrative closure:

> Around June 24, 2009, after counsel had an opportunity to enter in certain edits [to the working draft of the franchise agreement], you and I advised the judge that an administrative order be entered. However, at that point, I certainly did not advise the judge that our clients had settled.

Aplt. Addendum at 139. Lee insisted that the message conveyed was the same as the representation of settlement incorporated in the ensuing orders:

> This case settled. You and I agreed that it was settled on June 23, 2009, and agreed that I could advise Magistrate Judge Argo of this fact. I did so. Judge Argo then filed an Order on June 24, 2009, stating that the case had settled. Also on June 24, 2009, [District Court] Judge Russell issued an Administrative Closing Order also stating that the case had settled. You never objected to either of those two Orders. All that remained after June 25, 2009 was formalizing documents that would reflect the terms of the settlement that had been agreed to by the parties' representatives. Mr. Jernigan and Ms. Karns can verify this and all other aspects of your negotiations and conversations.

*Id.* at 140 (citations omitted).

GET obtained an extension of the soon-to-expire Administrative Closing Order and then filed a motion to reopen the case. The City did not oppose the

-12-

motion and the case was reopened on August 24, 2009.  Three weeks later, on September 15, 2009, the City filed a motion to enforce the settlement, which was set for hearing on November 20, 2009.

## II.  DISTRICT COURT HEARING AND DECISIONS

At the hearing, the parties submitted the various communications and draft agreements discussed above.  The district court also heard testimony from Karns, Jernigan, and Wahab.  Most of the salient aspects of this testimony has already been touched upon.  But given the centrality of the point, it is important to focus further on Wahab's explanation for his silence in the face of the two orders expressly reciting the critical fact–which he later denied–that the parties had settled the case.

Wahab acknowledged that he had read the orders and made no objection. Aplt. App. at 857-58.  Both the district court and counsel for the City pressed him for an explanation as to how he could acquiesce in language explicitly confirming settlement while continuing to maintain that the parties had not settled the case. His response was to deflect the critical point about the parties' representation of settlement, by focusing instead on the procedural effect of the closure order.  He stated that he was not concerned about the order because, as it was merely "administrative" and preserved the possibility of reopening the case, it "was sufficient for the purposes [he] had in mind."  *Id.* at 860; *see also id.* at 858-61. In short, his gloss on the court's unqualified reference to the parties' settlement of

-13-

the case interjected the novel qualification "that we settled [*but only*] *for purposes of administrative closure* of the case." *Id.* at 860 (emphasis added).

Sometime after the hearing, the district court issued its order granting the City's motion to enforce. The court found as a matter of fact that (1) the parties had reached a tentative settlement at the June 9, 2009, conference, based on their resolution of the material points of the franchise agreement; (2) this accord was set out, in a form admittedly requiring further revisions to language, in a draft agreement approved by the City Council on June 17, 2009; (3) the parties told the court they were prepared for administrative closure of the case and, after orders effecting closure were issued, did not object to the unqualified recitation therein that they had informed the court that the case was settled; (4) a revised draft of the franchise agreement, reflecting all of the material terms previously agreed upon (with two deviations that the City later conceded and corrected[2]), was approved by Wahab on behalf of GET; (5) thereafter, however, Wahab informed Karns that GET wanted to renegotiate numerous terms; (6) Lee informed Wahab that the City insisted on adherence to their existing accord, including execution of the settlement agreement Lee had prepared reflecting the terms agreed upon at the June 9 conference (though with one deviation that Lee conceded and agreed to

---

[2]    These involved the parties' agreement on the limitation of the franchise fee to 3.5% (with no provision for any upward revision), and the exclusion of internet services from the determination of the gross revenues on which the franchise fee would be computed.

drop at the evidentiary hearing on the motion to enforce[3]).  *See* District Court

Order dated Dec. 23, 2009, at 2-6 (Aplt. App. at 453-57).

After setting out these factual findings, the court recited several pertinent

legal principles, including (1) the basic contractual requirement of agreement on

material terms, with the related qualification that such material agreement is not

nullified by the reservation of unspecified details; (2) the recognition that

settlement agreements are contracts summarily enforceable by the court and may

not be repudiated absent fraud, duress, undue influence, or mistake; (3) the

presumption (found by the court not to have been rebutted here) that a party's

attorney, in particular GET attorney Wahab, has the authority to enter a

settlement agreement on behalf of his client; and (4) the power of the court to

reform a written agreement when (as the court found here) the writing does not

express the parties' real intentions or actual agreement due to accident, mutual

mistake, or unilateral mistake coupled with inequitable conduct by the other

party.  *See id.* at 6-8 (Aplt. App. at 457-59).  These basic legal premises are not

challenged on appeal, though, as we will discuss shortly, GET does object to the

applicability of the reformation principle to the facts here.

---

[3]      This involved the prohibition on Deffner seeking any other cable franchise, to be effectuated by his own personal execution of the settlement agreement.

Finally, the court set out its disposition of the motion to enforce in light of the preceding facts and law. As to the overarching settlement agreement, the court concluded:

> Plaintiff and Defendant herein entered into a settlement agreement in which they agreed to all material terms of a new franchising agreement between Get, L.L.C. and the City of Blackwell and mutual releases, dismissal of this action with prejudice; that each party would bear its own costs and attorney fees; that Get, L.L.C. would within forty-five days of execution of a written settlement agreement pay to the City of Blackwell all franchise fees [on revenues] collected from January 1, 2009 through the date of the City's approval of the franchise agreement, accompanied by the reports and documentation required in the new franchise agreement; that Get, L.L.C. would immediately discontinue charging City of Blackwell customers a $5.00 fee for litigation expenses; and that the pole attachment agreement would provide for a total charge to Plaintiff of $3.50 per pole.

*Id.* at 8 (Aplt. App. at 459). As to the franchise agreement on which the settlement was based, the court concluded:

> The franchise agreement to which the parties agreed is the Blackwell Franchise Draft . . . approved by the City Council of the City of Blackwell on June 17, 2009, as revised in form as reflected in the Blackwell Franchise Agreement Draft dated July 1, 2009 but reformed to reflect the terms to which the parties actually agreed at the Settlement Conference of June 9, 2009, as follows: [the clause permitting upward revision of the agreed upon 3.5% franchise fee is stricken] because it is inconsistent with the franchise fee to which the parties agreed; and [the reference to revenue from internet services is stricken from the definition of gross revenues] as contrary to the terms to which the parties agreed.

*Id.* at 8-9 (Aplt. App. at 459-60) (citations omitted).

-16-

GET sought reconsideration of the court's decision by filing a motion for new trial or to alter or amend judgment, arguing in pertinent part that the court erred by (1) sua sponte considering reformation of the parties' agreements; (2) finding that reformation was warranted on the facts; and (3) failing to address a statute of frauds defense raised by GET in opposition to the City's motion to enforce the settlement. In support of the first point, GET cited *Hardiman v. Reynolds*, 971 F.2d 500 (10th Cir. 1992), which recognized that "[g]enerally, where the parties have not raised a defense, the court should not address the defense sua sponte." *Id.* at 502. The district court rejected this argument, holding that "*Hardiman* and the proposition for which it is cited are inapposite" because "reformation of the franchise agreement drafts to reflect or conform to the parties' actual oral agreement was not *a defense* to enforcement." District Court Order dated Feb. 16, 2010, at 2 (Aplt. App. 633) (emphasis added).

As to the second point, GET argued that the equitable requirements for reformation (mutual mistake, or unilateral mistake coupled with inequitable conduct) were not present to support the district court's correction of the proffered settlement documents to reflect the parties' prior agreement. That is, GET did not challenge the substance of the reformed terms (which actually favored GET) but only the court's justification for engaging in the reformation. On its face, this seems an oddly self-denying position to take: the success of the challenge, i.e., a recognition that the terms should not have been reformed, would

-17-

entail a settlement less favorable to GET. But GET pressed this point to insist that "[t]he appropriate holding in this case would have been for the Court to have found that reformation of the agreement presented by the [City] at the hearing was not appropriate *and to have denied the Motion to Enforce*." Aplt. App. at 541 (emphasis added). Its cursory argument did not, however, explain how a successful challenge to reformation would lead to the denial of the motion to enforce, as opposed to enforcement of the proffered agreement with its terms intact. In any event, the district court did not probe this analytical disconnect in GET's argument, but chose instead to reject it head-on by holding that testimony at the hearing clearly and convincingly showed that the reformed terms were consistent with the parties' contractual intent and that the deviations therefrom had been "scrivener's errors or were due to a mutual mistake on the part of the parties' agents in reducing the parties' actual agreement to writing." District Court Order at 2 (Aplt. App. at 633).

Finally, the district court held that GET had waived any argument based on the statute of frauds. The court noted that GET had not raised the defense in its written response to the City's motion to enforce settlement or at the hearing on the motion. *Id.* at 4 (Aplt. App. at 635). GET had attempted to raise the defense in its proposed findings and conclusions submitted after the hearing, but the court pointed out that by then it had already announced its decision on the existence and enforceability of the settlement at the hearing and had solicited proposed

findings and conclusions from the parties solely to memorialize its decision, not to interject new issues. *Id.* at 3-4 (Aplt. App. at 634-35). This "belated, after-the-ruling assertion of a statute of frauds defense came too late" and hence was "deemed waived." *Id.* at 4 (Aplt. App. at 635).

### III. ISSUES ON APPEAL

### A. Whether Negotiations Culminated in a Binding Settlement

GET contends the district court erred in finding that the parties' settlement negotiations had culminated in a binding agreement to settle the case. As noted earlier, we review this finding for clear error. Under this standard, we defer to the district court's finding unless, "view[ing] the evidence in the light most favorable to the district court's ruling," we are "left with the definite and firm conviction that a mistake has been committed." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 599 F.3d 1165, 1175 (10th Cir. 2010) (internal quotation marks omitted). It is not our province to second-guess the district court's assessment of an inconclusive evidentiary record:

> Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse. That proposition holds true, not only when the district court's factual findings are predicated upon assessments of witness credibility, but also when they arise from consideration of documentary evidence.

*Id.* (alteration, citations, and internal quotation marks omitted).

The evidence is sufficient under this standard to affirm the district court's finding that a binding settlement on material terms had been reached by the time the parties told Magistrate Argo it was appropriate to enter the administrative closure order. The attorneys' communications to each other as they completed work on the draft agreement, their representation to the magistrate judge, and their acquiescence in the ensuing orders expressly reciting that they had reached settlement, support the court's determination.

GET contends that the record reflects only a series of proposals and counter-proposals, which never culminated in a binding agreement, comparing this case with *In re De-Annexation of Real Property*, 204 P.3d at 89, 92. We disagree. The evidence recounted in detail earlier was quite plausibly considered by the district court to reflect a series of corrections and refinements converging on a binding settlement intended to capture a set of previously agreed-upon material terms. And, significantly, the parties' representations and conduct with respect to the administrative closure order properly colored the district court's assessment of the record here in a way that has no counterpart in the case on which GET seeks to rely.

GET argues strenuously that the rejection of its demand for reduction of the security fund, made by Wahab to Karns before the draft franchise agreement was presented to the City Council, reflects the absence of an accord on a material term. But the testimony on this point was conflicting. Wahab testified that

-20-

reduction of the security fund was a critical point–"that [it] could be a terrible deal breaker," Aplt. App. at 851–while Karns testified that, after she explained that the City would not accept the change, Wahab "withdrew it," *id.* at 731. Resolution of the matter was clearly the province of the district court as factfinder. And we note that other, undisputed circumstances surrounding the incident support the district court's determination that the draft presented to the City Council, with the original security fund provision intact, reflected the parties existing accord (albeit, with certain other terms reformed by the court). In particular, Wahab did not even mention the provision, included since the first working draft was prepared months before, when he received subsequent drafts retaining it–drafts on which he commented favorably in very broad terms and upon which he ultimately agreed to the administrative closure order. That is entirely consistent with Karns's account that Wahab had withdrawn his request for alteration of the security fund provision. Mention of the matter did not recur until the email of July 13 that interposed a whole set of new terms and material changes to the agreement previously reached.

Finally, GET points to those new terms and changes as indicative of the lack of agreement, but they do not negate the existence of the prior agreement reached and communicated to the court. We are not aware of any authority, and GET cites none, supporting the facially untenable notion that a party may nullify a binding accord after the fact by simply interjecting new demands.

-21-

**B. Whether Reformation of the Agreements Proffered for Enforcement was Procedurally and Substantively Proper**

As in its post-judgment motion below, GET objects, on procedural and substantive grounds, to the district court's reformation of the agreements submitted by the City with its motion to enforce settlement. Again, GET's procedural objection relates to the district court's sua sponte consideration of reformation to correct certain terms to conform with material points it found the parties had agreed on in settlement negotiations. But on appeal GET does not challenge the district court's rationale for rejecting this objection, i.e., that the restriction on sua sponte recognition of defenses recited in the *Hardiman* case relied on by GET is inapplicable because reformation was not used here as *a defense* in the settlement dispute. Indeed, GET does not even mention *Hardiman*. Instead, its argument on appeal is that sua sponte reformation somehow "relieved and absolved the [City] from establishing the necessary elements required for reformation." Aplt. Opening Br. at 23. But this essentially collapses the procedural objection into the substantive issue whether reformation was warranted on the facts. If the district court properly ruled that the errant terms warranted reformation, GET's current challenge to the sua sponte nature of that ruling has nothing to stand on. Thus, it would appear that GET has effectively abandoned its purely procedural objection regarding reformation.

In any event, we would not reverse the district court's reformation ruling for procedural irregularity. Even if the rule against sua sponte consideration of issues applied beyond defenses, so as to reach the reformation issue considered by the district court, the rule has "at least two important exceptions," *Hardiman*, 971 F.2d at 502, one of which is implicated here. That exception permits courts to acknowledge unargued legal issues when "values that may transcend the concerns of the parties to an action" are involved. *Id.* "[J]udicial efficiency"–avoiding "the expenditure of scarce federal judicial resources"–is one of those values. *Id.* at 503. It is also one of the recognized benefits for which the private settlement of litigation is favored in the federal courts. *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1369 (Fed. Cir. 2001) (noting "compelling public interest and policy in upholding and enforcing settlement agreements" and thereby "fostering judicial economy"); *Stewart v. M.D.F., Inc.*, 83 F.3d 247, 252 (8th Cir. 1996) (noting "judicial policy favoring settlement . . . rests on the opportunity to conserve judicial resources"). And reformation of the agreements proffered for enforcement by the City, which enabled the court to reach a fair and final resolution of the matter, was certainly "relevant to the proper disposition of [the City's] motion," *United States v. Lugo*, 170 F.3d 996, 1002 (10th Cir. 1999). Under the circumstances, the court did not err procedurally in considering reformation.

Turning to the substantive objection, we note that GET fails to explain how its challenge to the district court's reformation of certain terms could support the relief it seeks on appeal. GET argues for a reversal of the order enforcing settlement and remand for trial on the merits, Aplt. Opening Br. at 30–not for a remand directing the district court to enforce the settlement with unreformed terms. The disconnect between argument and relief sought does not arise to the extent GET challenges reformation on the threshold basis that *there was no antecedent agreement* to serve as the touchstone for reforming the drafts proffered at the hearing. *See generally Dennis v. American-First Title & Trust Co.*, 405 P.2d 993, 997 (Okla. 1965) (explaining that reformation requires "a preliminary agreement, a prior contract, either written or verbal, by which to make the rectification, or to which the instrument can be conformed" (quotation omitted)). But, of course, our affirmance of the district court's finding on that factual point above forecloses such a challenge here.[4]

---

[4]    In its Reply Brief, GET develops a new, legal challenge to the antecedent accord used by the district court as the basis for reformation. GET contends that City Council approval was necessary to bind the City to a franchise agreement and, hence, the first binding accord on material terms could only be reflected in the draft agreement approved by the Council on June 17. Thus, any erroneous terms present in that draft–such as the franchise fee terms later reformed by the district court–would necessarily have lacked the antecedent accord required for reformation. *See* Aplt. Reply Br. at 7-8. GET bases this argument on Okla. Stat. Ann. tit. 11, § 22-107.1(A), which states that "[a] municipality may by ordinance or otherwise issue a certificate, license or permit, for the operation of a cable television system," and on *id.* § 22-107, which states that "[m]unicipal

(continued...)

-24-

In any event, notwithstanding the disconnect with the relief GET seeks, the bulk of its substantive argument is that an equitable basis for reforming terms in the enforced agreement–clear and convincing evidence of mutual mistake or unilateral mistake and inequitable conduct by the other party–was not established. *See generally Okla. Oncology & Hematology P.C. v. US Oncology, Inc.*, 160 P.3d 936, 947 n.22 (Okla. 2007) ("Reformation requires proof of the contract to be reformed and proof, by clear and convincing evidence, of a mutual mistake or mistake by one party and inequitable conduct on the part of the other that resulted in a written contract that did not reflect the parties' intent."). Even taken on its own terms, this argument fails. There is no reversible error in the district court's finding that the provisions it reformed had deviated from the parties' prior common understanding due to "a mutual mistake on the part of the parties' agents in reducing the parties' actual agreement to writing." District Court Order at 2

---

[4](...continued)
licenses and license fees shall be regulated by ordinance." The qualification "by ordinance *or otherwise*" potentially undercuts this argument in a way that GET fails to address, and GET also does not explain why a need for City Council action to license a cable operator would necessarily bar the City from separately negotiating franchise terms capable of judicial enforcement. But we need not pursue the matter. GET did not adequately develop this argument in its Opening Brief, nor did it make an argument in this regard to the district court, even when it raised other objections to reformation in its motion for new trial. The matter has been waived and we decline to consider it. *See, e.g.*, *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1176 n. 20 (10th Cir. 2010).

-25-

(Aplt. App. at 633).[5]  Although proof of mutual mistake requires clear and

convincing evidence, the trial court's determination that this burden was met is

afforded some deference:

> Evidence to sustain a judgment reforming a contract must be clear,
> unequivocal, and decisive, but this does not mean that it must be
> uncontradicted; and the judgment of the trial court in such an action,
> where the evidence is conflicting, should be given weight, and should
> be affirmed on appeal, unless the appellate court is satisfied that the
> standard of proof required has not been met and the conclusion
> reached is wrong.

*Nelson v. Daugherty*, 357 P.2d 425, 432 (Okla. 1960) (internal quotation marks

omitted); *see also Henderson v. Henderson*, 595 P.2d 462, 464 (Okla. Civ. App.

1979) (holding "mere existence of contradictory evidence in the record does not

prevent some of it from being clear, full, unequivocal, or convincing").  And this

includes a recognition of the trial court's advantage in assessing the testimony of

witnesses it has observed first-hand.  *Nelson*, 357 P.2d at 432 (noting precedent

affirming reformation where "evidence was conflicting" and "pointing out that the

trial court, which had the witnesses before it and had an opportunity to observe

their demeanor and to determine their credibility, had decided the issue in favor

---

[5]     The district court also referred to "scrivener's errors," District Court Order
of Feb. 16, 2010, at 2 (Aplt. App. at 633), but in context this was just another way
of referring to the mutual mistake in drafting cited above.  Numerous Oklahoma
cases reflect the same relationship between scrivener error and mutual mistake.
*See, e.g.*, *Pangaea Exploration Corp. v. Ryland*, 173 P.3d 108, 113 n.11
(Okla. Civ. App. 2007); *Davenport v. Beck*, 576 P.2d 1199, 1201 (Okla. Civ. App.
1977).

of the plaintiff" (internal quotation marks omitted)); *Henderson*, 595 P.2d at 465 (affirming judgment reforming instrument and stressing trial court's "significant advantage of observing the demeanor of the witnesses").

As already recounted in considerable detail, ample evidence, testimonial and documentary, indicated that the modifications effected by the district court to bring the reformed terms in line with the parties' prior agreement were necessitated by mutual errors and oversights in the back-and-forth process of getting the draft documents into final form. After the deviating terms–provisions unfavorable to GET and Deffner regarding the franchise fee, the definition of gross revenue to which the fee applied, and the personal prohibition on Deffner's operation of another cable franchise–were eventually recognized and pointed out, the City conceded that it was appropriate to correct them so as to effectuate the prior understanding that counsel for GET insisted had been mutually reached.[6]

---

[6] Indeed, while we agree with the district court that the evidence supported these corrections, we are not at all sure they are reformations to which GET, whom they favored, may even object. The burden of justification obviously rests on the party seeking the reformation. *See, e.g.*, *Thompson v. Estate of Coffield*, 894 P.2d 1065, 1067 (Okla. 1995); *Smiley v. Jaggers*, 327 P.2d 652, 654 (Okla. 1958); *Bellamy v. Bellamy*, 220 P. 844, 846 (Okla. 1923). The terms reformed by the district court were modified in accordance with points insisted upon by GET, not by the City (which just conceded the corrections). We are not aware of any Oklahoma authority placing a proof-of-reformation burden on a contracting party who makes a concession to its counterpart, nor any authority permitting the latter to challenge the agreement modified in its own favor. But our affirmance of the modifications made by the district court obviates further consideration of these other potential deficiencies in GET's position on appeal.

Under the standard of review specified above, we are satisfied that the district court did not err in its handling of the matter.

## C.  Statute of Frauds

Finally, the district court rejected GET's belated attempt to interject a statute-of-frauds objection after it had announced its decision, at the hearing on the motion to enforce, that the parties had reached a binding settlement.  Our standard of review on this point is not entirely clear.  "Generally, whether a party has waived an affirmative defense is a mixed question of law and fact, requiring us to accept the district court's factual conclusions unless clearly erroneous but review the application of the facts to the law under a de novo standard." *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1075 (10th Cir. 2009) (internal quotation marks omitted).  But here we are not dealing with the typical affirmative defense asserted in response to a pleading at the commencement of the action and governed, for purposes of preservation and waiver, by the directives of Fed. R. Civ. P. 12.  We are dealing with a response to a motion, where the trial court's judgment regarding preservation and waiver of objections is not guided by these directives.  This circuit has precedent in non-pleading contexts applying an abuse-of-discretion standard in reviewing the district court's judgment that a party has waived an issue.  *See, e.g.*, *O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188, 1207 (10th Cir. 2004) (involving waiver of argument about post-judgment interest rate); *United States v. Coyote*, 963 F.2d 1328, 1332 (10th Cir. 1992)

-28-

(involving waiver of motion to suppress evidence). Neither of these lines of authority specifically involves waiver of an affirmative defense to enforcement of a challenged settlement agreement.

In light of this uncertainty, we review the district court's ruling so as to take account of both standards: we will affirm if we can do so under the strict de novo standard, *Taumoepeau v. Mfrs. & Traders Trust Co.* (*In re Taumoepeau*), 523 F.3d 1213, 1218 (10th Cir. 2008) (noting choice between de novo and deferential review standard "is immaterial to our conclusion, for we would affirm even under the *de novo* standard"); and we will reverse if we must do so under the generous abuse-of-discretion standard, *Lorillard Tobacco Co. v. Engida*, 611 F.3d 1209, 1214 n.5 (10th Cir. 2010) (noting choice between de novo and deferential review standard was unnecessary if "we must reverse the district court even under the more generous abuse-of-discretion standard"). Of course, these dispositional alternatives are not exhaustive, and if neither is open to us, a definitive choice of the controlling review standard would be necessary. As it happens, we conclude that affirmance is proper here under a de novo standard.

GET contends the district court erred in holding that it had waived the statute of frauds objection, because (1) counsel raised the issue in his opening statement at the hearing; and (2) the objection could have been supported by facts that came out at the hearing. Neither point has merit. Counsel for GET merely referred to the statute of frauds once in passing, without any attempt whatsoever

to tie the conclusory reference to any basis in law or fact applicable to this case. *See* Aplt. App. at 675.[7]  That was patently inadequate to present and preserve the issue.  *See, e.g.*, *United States v. Hardwell*, 80 F.3d 1471, 1492 (10th Cir. 1996); *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721-22 (10th Cir. 1993).  And simply because the hearing record "could conceivably have provided a factual basis for [the issue], that is not enough; a party must also present the legal basis of the claim to the district court clearly and explicitly."  *Shoels*, 375 F.3d at 1061. We agree with the district court that any statute-of-frauds argument was waived.

The judgment of the district court is AFFIRMED.


Entered for the Court

David M. Ebel
Circuit Judge

---

[7]     After summarizing GET's basic position that no settlement had been reached, counsel simply added, with no antecedent (or subsequent) development of the point:  "And . . . [w]e think it [the settlement] is barred by the statute of frauds."  Aplt. App. at 675.