**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 27, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ARNOLD N. LARSON, individually;
ARLA L. HARRIS, Trustee, Arnold A.
Larson Trust; ARNOLD N. LARSON,
beneficiary of Arnold A. Larson Trust,

     Plaintiffs - Appellees,

v.

CHARLES R. LARSON,

     Defendant - Appellant,

and

DEBRA M. LARSON,

     Defendant.

No. 16-8065
(D.C. No. 2:15-CV-00150-NDF)
(D. Wyoming)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **KELLY**, **LUCERO**, and **McHUGH**, Circuit Judges.
_____

     After the death of their father, a dispute arose among Arnold N. Larson

("Arny"), Arla L. Harris, and Charles R. Larson regarding the administration of his

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

trust.[1] Among other issues, the parties disagreed on the proper distribution of their father's interests in the Larson Hereford Ranch Limited Partnership ("Partnership") and a parcel of real property known as the Larson Hereford Ranch ("Ranch"). As a result of this disagreement, siblings Arny and Arla filed suit alleging that their brother, Charles, had violated the terms of their father's trust and had breached various duties associated with his position as trustee of the trust. The parties later attended court-ordered mediation, at which they signed similar, but not identical, versions of a settlement document entitled Basic Terms of Settlement ("Basic Terms"). Shortly thereafter, the parties informed the district court that they had resolved all claims between them. They then attempted to finalize a more comprehensive settlement agreement entitled Mutual Release and Settlement. Although multiple drafts of the comprehensive settlement document were circulated, the parties ultimately reached an impasse, and Arny and Arla asked the district court to enforce either the Basic Terms or a draft of the Mutual Release and Settlement to which they believed all parties had previously agreed.

After a comprehensive evidentiary hearing, the district court granted Arny and Arla's request and enforced the fourth draft of the Mutual Release and Settlement ("Settlement Agreement") as the parties' final settlement agreement. In its order, the

---

[1] Debra M. Larson did not join this appeal. Therefore, references to "the parties" in this order refer only to siblings Arnold N. Larson, Arla L. Harris, and Charles R. Larson. Like the parties and the district court, we refer to the parties by their first names for clarity. And we distinguish between Arnold A. Larson and Arnold N. Larson by referring to the latter as "Arny."

district court determined, among other things, that the Settlement Agreement applied to both the Ranch and the Partnership, and that Charles had settled and released all of his claims relating to ownership of both. Charles filed a timely appeal challenging the district court's decision that the Settlement Agreement applies to claims of ownership in the Ranch, including his individual claim to the property. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.        BACKGROUND

### A.        *Factual History*

### 1.        Catherine N. Larson's Interest in the Ranch

Arnold A. Larson and Catherine N. Larson, parents of all parties to this appeal, each owned an undivided one-half interest in the Ranch as equal tenants in common. During her estate planning, Catherine created the Catherine N. Larson Revocable Trust and designated her one-half interest in the Ranch, along with other individually owned property, as property of the trust. The terms of Catherine's trust dictated that upon her death all then-existing trust property was to be divided between two separate trusts: the "Husband's Trust" and the "Family Trust." Catherine predeceased Arnold A. Larson by more than thirty years, leaving him with various powers of appointment and as sole trustee of her revocable trust.

The parties dispute which sub-trust Catherine's one-half interest in the Ranch was placed in upon her death. But, apparently believing it was transferred to the Family Trust and pursuant to his power of appointment over that trust, Arnold A. Larson included the following provision in his Last Will and Testament:

3

(1)　　LARSON HEREFORD RANCH PROPERTY. All of the interest of the FAMILY TRUST of The CATHERINE N. LARSON TRUST in any ranch real estate (including any home located thereon), cattle, horses, hay, grain, and machinery and all other customary ranch properties, shall be distributed to my son, [Arny], if he survives me.

Accordingly, after Arnold A. Larson's death in 2012, the surviving trustees of the Catherine N. Larson Revocable Trust deeded Arny a one-half ownership interest in the Ranch.

## 2.　Arnold A. Larson's Interest in the Ranch

Approximately twenty-four years prior to his death, on December 27, 1988, Arnold A. Larson formed the Partnership with two of his sons, Charles and David J. Larson. At the time the Partnership was created, Arnold A. Larson owned forty-eight percent of the Partnership as a General Partner and forty-eight percent as a Limited Partner. Each son owned a two percent interest as a General Partner.[2] Three days later, on December 30, 1988, Arnold A. Larson deeded his undivided one half-interest in the Ranch to "ARNOLD A. LARSON, CHARLES R. LARSON and DAVID J. LARSON and the survivors and survivor thereof, General Partners of LARSON HEREFORD RANCH[] LIMITED PARTNERSHIP." Charles contends this deed transferred his father's one-half interest in the Ranch, not the Partnership, but that it conveyed that interest to Arnold A. Larson, Charles, and David in their personal and individual capacities. As a result, he claims he holds an individual

_____

[2] Charles claims that Arnold A. Larson gifted a two percent interest in the Partnership on an individual and annual basis to himself, Debra M. Larson (Charles's wife), David J. Larson, and Jeannie K. Larson (David's wife). Charles alleges this practice occurred from 1988 until 1995.

ownership interest in the Ranch separate and apart from any interest he holds in the Partnership. Arny and Arla dispute this contention, arguing the deed transferred the one-half interest in the Ranch to the Partnership.

Over a decade later, before any dispute arose regarding the interests in the Ranch, Arny and Arla contend that Arnold A. Larson held two meetings with his children and his attorney to discuss his estate plan. At these meetings, which occurred in 2002 and 2003, Arnold A. Larson allegedly indicated his desire for the Ranch to go to Arny, and for Charles and David to receive cash gifts in return for their interests in the Partnership and Ranch. Charles notes he was not in attendance at the 2003 meeting and disputes the existence of any agreement to exchange his interests in the Partnership and Ranch for cash. And while it is undisputed that both Charles and David received cash gifts from their father, Charles asserts the gifts were not connected to any transfer of the brothers' interests in the Partnership and Ranch.

In 2004, Arnold A. Larson executed the First Amendment to and Restatement of the Arnold A. Larson Trust ("Trust"). The terms of the amended trust provide, in relevant part:

> (1) <u>LARSON HEREFORD RANCH LIMITED PARTNERSHIP</u>. All of the Grantor's interest in LARSON HEREFORD RANCH LIMITED PARTNERSHIP, a Wyoming limited partnership (the "Partnership"), together with the Grantor's interest in any ranch real estate (including the Grantor's home located thereon), cattle, horses, hay, grain, and machinery and all other customary ranch properties, that is owned by the Grantor or this trust at the time of Grantor's death, shall be distributed to Grantor's son, [Arny], if he survives the Grantor.

The Trust also designates Charles and Arla as co-trustees.

5

Arnold A. Larson passed away in early 2012. Sometime after his father's death, and after receiving Catherine's one-half interest in the Ranch, Arny requested that Charles and Arla administer and distribute their father's trust. Although the parties dispute whether any distributions were made pursuant to the Trust in the four years after their father's death, they agree that Charles refused to distribute complete ownership of the Partnership and the remaining one-half ownership interest in the Ranch to Arny due to disagreement concerning their ownership. Despite further communications and family mediation, the parties could not reach an agreement regarding the proper administration of the Trust.

### B.    *Procedural History*

On July 20, 2015, Arny, individually and as a beneficiary of the Trust, and Arla, as trustee of the Trust, filed suit against Charles and his wife, Debra, in Wyoming state court. Arny and Arla alleged Charles had breached: (1) the terms of the Trust; (2) his fiduciary duties; and (3) his duty of good faith and fair dealing. They also sought declaratory judgments regarding ownership of the Partnership, which they alleged owned their father's one-half interest in the Ranch, and regarding Charles's alleged improper use of Trust funds and assets. Finally, they requested a preliminary injunction barring Charles from using Trust funds until a resolution of the lawsuit was reached.

Charles and Debra filed a Notice of Removal to the United States District Court for the District of Wyoming on the basis of diversity jurisdiction. The federal district court entered an order of removal on September 3, 2015. Shortly thereafter,

6

on September 28, 2015, the district court denied Arny and Arla's motion for a preliminary injunction, and the parties subsequently filed a Joint Case Management Plan ("JCMP") setting forth, among other things, the parties' claims, defenses, and condensed factual allegations. The JCMP included contentions from both sides regarding ownership of the Ranch, including Charles's allegations that: (1) the 1998 deed is unclear as to whether it "transferred the one-half interest [in the Ranch] to the Partnership or to the General Partners thereto in their personal capacities"; and (2) Catherine's one-half interest in the Ranch was held in the Husband's Trust, as opposed to the Family Trust, and therefore it had been improperly distributed to Arny. On October 30, 2015, the district court ordered the parties to attend mediation and to file a joint status report regarding the outcome.

The parties attended mediation in Denver before retired Judge William Downes in late 2015. During the mediation, counsel for Charles and Debra presented a PowerPoint presentation (the "presentation") detailing issues surrounding ownership of the Ranch and Partnership. At the conclusion of the mediation, the parties executed differing versions of the Basic Terms agreement,[3] and later filed a

---

[3] Charles and Debra signed a slightly different document than that signed by Arny, Arla, and other beneficiaries of the Trust. While the provisions relevant to our inquiry are identical in both documents, the version signed by Arny and Arla includes two additions added after Charles and Debra left the mediation: (1) in paragraph five, which states "[j]oint stipulation to dismiss with prejudice upon: [s]igning the agreement," the version signed by Arny and Arla includes the addition of "& will not file any case in any other action"; and (2) a new paragraph 12 that states: "All beneficiaries release Arla Harris from any claims or demands for arising from or related to any act or omission as Trustee prior to this date."

7

joint status report to the district court stating that "[a]t th[e] mediation, the Parties were able to reach a resolution concerning all claims between them."

In relevant part, both executed versions of the Basic Terms include the following provisions: (1) in exchange "for all [of their] [P]artnership interests," Charles and Debra are to retain the approximately $135,000.00 of Partnership funds they had previously withdrawn, and to receive an additional $105,000.00 payment from Arny and Arla within forty-five days; (2) Charles is to immediately resign as co-trustee of the Trust and partner of the Partnership, and Debra must resign as partner of the Partnership and waives any right to Partnership property or funds; (3) any remaining Trust funds are to remain under the control of Arla as sole trustee; (4) the parties jointly stipulate to dismiss the lawsuit with prejudice upon signing of the agreement; (5) formal settlement documents are to be prepared by defense counsel with input from plaintiffs' counsel, and if formal documents are not signed within thirty days "these basic terms shall be the full final agreement"; and (6) "[t]he parties understand that th[e] document is a binding enforceable agreement and may be submitted to a court to prove the existence of the agreement or for enforcement." In addition, the parties checked a box in paragraph three, next to the term "Full," which indicates the settlement and release applies to "all claims that could or did arise between the parties known or unknown."

On January 8, 2016, Arny's counsel emailed counsel for Charles and Debra to inquire about the status of the formal settlement agreement anticipated by the Basic Terms. Because no draft was forthcoming, Arny's counsel produced and circulated a

8

draft agreement, entitled Mutual Release and Settlement, to all counsel on January 27, 2016, approximately thirty-seven days after the Basic Terms had been signed. This initiated a negotiation process that culminated in the creation of four draft Mutual Release and Settlement agreements, the last of which, the Settlement Agreement, was circulated on February 4, 2016.

Four days later, on February 8, 2016, counsel for Arny emailed Charles and Debra's counsel to inquire whether the Settlement Agreement constituted the final release agreement. Charles and Debra's counsel responded by circulating a new draft of the Mutual Release and Settlement agreement, which contained multiple substantive changes. Arny and Arla refused to sign the newly drafted agreement and indicated they believed all parties had agreed to the previous draft circulated on February 4, 2016. Thereafter, the parties were unable to agree on a final version of the formal release agreement and on February 10, 2016, Arny and Arla filed a motion requesting the district court to enforce the terms of the Settlement Agreement. Arny and Arla filed a supplemental motion on March 17, 2016, generally seeking enforcement of the Basic Terms and the Settlement Agreement.

The parties fully briefed the motions to enforce and the district court set an evidentiary hearing for May 19, 2016. Prior to the evidentiary hearing, Charles and Debra filed a motion seeking to bar Arny and Arla from obtaining, through discovery, the presentation used by their counsel during the mediation. A magistrate judge denied the motion, finding the presentation to be discoverable under Wyoming law.

9

On May 19, 2016, the district court conducted an extensive evidentiary hearing on Arny and Arla's motions to enforce. Four days later, it granted Arny and Arla's motions, finding all parties had agreed to the fourth draft of the Mutual Release and Settlement and that the agreement constitutes a valid, enforceable settlement agreement. In its ruling construing the scope of the Settlement Agreement, the district court made factual findings that Charles had "agreed to a full release of all claims that could or did arise between the parties known or unknown," and that his "claims and contentions concerning ownership of the Larson Hereford Ranch lands and the Larson Hereford Ranch Partnership are known claims that DID arise between the parties to this case." It further found that Charles's "contention that the ranch land was not part of the partnership discussed at the mediation and is not subject to the release of claims in the [Basic Terms or the formalized Settlement Agreement] . . . is simply unsupported by the record" and "lacks any factual basis or legal authority." As a result, the district court concluded, among other things, that Charles had "promised a full release of [his] claims relating to the ownership of the ranch, and may not raise those claims now" as he "no longer ha[s] any claim to the [Partnership], the [Ranch], and the First Amendment to and Restatement of the Arnold A. Larson Trust."

Charles now appeals the district court's ruling.

## II.   DISCUSSION

Charles does not challenge the district court's determination that the Settlement Agreement constitutes a valid and enforceable agreement. Rather, he

10

contends the district court erred in broadly construing the agreement to extend to the Ranch and any individual ownership interest he may claim in it. Charles supports this contention by arguing that: (1) the Settlement Agreement makes no mention of the Ranch or his alleged individual ownership interest therein; (2) the magistrate judge and district judges erred by allowing the discovery and admission into evidence of the presentation used at mediation; and (3) the district court improperly relied on extrinsic evidence to determine the agreement applied to the Ranch.[4] We disagree, and conclude: (1) the district court properly construed the Settlement Agreement as a full and final settlement of all claims that had arisen during the case, including Charles's claim of individual ownership in the Ranch; (2) even assuming, without deciding, that the presentation should not have been admitted into evidence, any presumed error is harmless; and (3) the district court's consideration of the JCMP when construing the Settlement Agreement was permitted under Wyoming law.

"We review a district court's decision to enforce a settlement agreement for abuse of discretion." *Walters v. Wal-Mart Stores, Inc.*, 703 F.3d 1167, 1172 (10th Cir. 2013); *see also Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004) (holding

---

[4] Charles also argues the district court erred in finding the Settlement Agreement settled and released his individual claims of ownership in the Ranch because the agreement only identifies him in his capacities as a trustee and partner, and therefore cannot be read as a release of any claims he raised as an individual. Charles did not raise this argument before the district court. We therefore do not consider it here. *United States v. McCall*, 235 F.3d 1211, 1216 (10th Cir. 2000) ("The general rule is that this court will not consider an issue on appeal that was not raised below."); *Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 720–22 (10th Cir. 1993) (noting "we have consistently refused invitations to consider new issues on appeal" and "have therefore repeatedly stated that a party may not lose in the district court on one theory of the case, and then prevail on appeal on a different theory").

"[a] trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it" and that we review such decisions "for abuse of discretion"). But because the parties do not dispute the enforceability of the Settlement Agreement, we limit our review to the district court's construction of that agreement. In doing so, we review the district court's legal interpretations de novo, *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008), and its factual findings for clear error, *Naimie v. Cytozyme Labs., Inc.*, 174 F.3d 1104, 1112 (10th Cir. 1999). "If [the] contract is ambiguous, the resolution of its proper meaning is a question of fact subject to review on a clearly erroneous standard." *King v. PA Consulting Grp., Inc.*, 485 F.3d 577, 589 (10th Cir. 2007) (internal quotation marks omitted). Finally, to the extent construction of a settlement agreement involves mixed questions of law and fact, we review it "under the clearly erroneous or de novo standard, depending on whether the mixed question involves primarily a factual inquiry or the consideration of legal principles." *Armstrong v. Comm'r of Internal Revenue*, 15 F.3d 970, 973 (10th Cir. 1994).

To resolve issues involving the construction of a contract, we apply state contract law. *United States v. McCall*, 235 F.3d 1211, 1215 (10th Cir. 2000); *see also Walters*, 703 F.3d at 1172. Under Wyoming law, "[a] settlement agreement is a contract and, therefore, subject to the same legal principles that apply to any contract." *Gould v. Ochsner*, 354 P.3d 965, 979 (Wyo. 2015) (quoting *In re Estate of Maycock*, 33 P.3d 1114, 1117 (Wyo. 2001)). The primary focus when construing a contract "is to determine the parties' intent, and . . . whether the language of the

12

contract is clear and unambiguous." *Reed v. Miles Land & Livestock Co.*, 18 P.3d 1161, 1163 (Wyo. 2001). "A contract is ambiguous if its language conveys a double meaning, lacks definiteness, or otherwise makes the meaning of a provision doubtful or uncertain." *In re Mark E. Dowell Irrevocable Trust #1*, 290 P.3d 357, 361 (Wyo. 2012). In such circumstances, the construction of an ambiguous contract "becomes a mixed question of law and fact," *Wadi Petroleum, Inc. v. Ultra Res., Inc.*, 65 P.3d 703, 708 (Wyo. 2003), and courts may consider "competent evidence of pertinent explanatory circumstances extraneous to the contract" in order to determine the intent of the parties, *In re Mark E. Dowell Irrevocable Trust #1*, 290 P.3d at 361. However, this evidence "may not . . . be used to contradict the terms of a written contract . . . [or] to supply an additional contract term." *Id.*

In contrast, if the contract language is unambiguous, we determine "the parties' intent from the words of the agreement as they are expressed within the four corners of the agreement," *Reed*, 18 P.3d at 1163, and enforce the contract "in accordance with the plain meaning its language would be given by a reasonable person," *Am. Nat'l Bank v. Sara*, 246 P.3d 294, 297 (Wyo. 2011) (quoting *Terris v. Kimmel*, 236 P.3d 1022, 1025 (Wyo. 2010)). In doing so, however, we may consider "the context in which the contract was written, including the subject matter, the purpose of the contract, and the circumstances surrounding its making . . . to help ascertain what the parties intended when they made the contract." *Id.* (quoting *Terris*, 236 P.3d at 1025); *see also In re Mark E. Dowell Irrevocable Trust #1*, 290 P.3d at 361 (holding that when contract language is unambiguous a court should not resort

13

to examining extrinsic or parol evidence, but that it "may . . . confirm its understanding of otherwise seemingly unambiguous language by reviewing evidence which, although extrinsic to the contract, complements that language by clarifying the context in which the agreement was drawn."). Finally, our construction is guided by the principles of good faith and common sense, as they are the "leading precepts of contract construction" under Wyoming law. *Reed*, 18 P.3d at 1163.

### A.     *The Settlement Agreement*

Applying these principles, we agree with the district court that the clear language of the Settlement Agreement, along with the context in which it was written, unambiguously indicates the parties' intent to settle "all claims that could or did arise between the parties, known or unknown," which necessarily encompasses claims of ownership in the Ranch, including Charles's individual claim. It is true, as Charles observes, that the Settlement Agreement does not expressly reference the Ranch. But ownership of the remaining one-half interest in the Ranch was undoubtedly at the forefront of the parties' dispute regarding Partnership and Trust property, and by agreeing to the Settlement Agreement, Charles plainly disclaimed any and all right, title, and interest in the Partnership, any and all rights to Partnership property or funds, and any rights to Trust funds or property.

More importantly, the Settlement Agreement contains expansive language indicating it is a final settlement and release of *all* claims, known or unknown, that could or did arise between the parties during this dispute. In relevant part, the Settlement Agreement states:

14

In *full and final settlement of all claims that could or did arise between the parties, known or unknown*, the parties agree as follows:

NOW, THEREFORE, based on the mutual promises of the parties, the terms of the [Basic Terms], together with other valuable consideration, the parties agree as follows:

1.      . . . Charles . . . [is] deemed to have and agree that [he] resigned and transferred any and all right, title and interest [he] held in the Partnership effective as of December 22, 2015 pursuant to the terms of the "Basic Terms of Settlement" agreed to at the mediation to [Arny] . . . .

2.      . . . Charles . . . waive[s] any and all rights to Partnership property or funds as of December 22, 2015 or as may exist in the future . . . .

3.      . . . Charles . . . renounces and waives any rights to any further distribution or claim to Trust funds or property.

. . .

8.      The parties agree that this *mutual release applies to all claims, whether known or unknown, past, present or prospective*, including unexpected consequences and complications arising from administration of the trust, or the tax treatment thereof, and all damages, losses, and expenses sustained by the Trust or Trustees on behalf of the Trust or by the Partnership or on behalf of the Partnership or by anyone claiming through the parties . . . . The undersigned agree to expressly assume the risk of any and all unknown claims or unknown consequences related to the Trust and/or Partnership, including consequences which could not reasonably be anticipated at this time. . . .

. . .

10.     *The parties covenant and agree never to commence*, voluntarily aid in any way, initiate, institute, maintain, prosecute, or authorize to be commenced *against each other any claim or complaint*, either at law or in equity, or other administrative, licensing, or regulatory action or proceeding against any person, group, or corporation covered by this Mutual Release and Settlement based in whole or in part *upon any claim, demand, cause of action, obligation, damage, or liability which is directly or indirectly related to the subject matter of this Release*.

15

11. . . . It is further understood that this is a *full and final release*, and [the parties] will not file any subsequent litigation in any other action.

12. All parties shall execute a stipulation of dismissal with prejudice to dismiss the pending lawsuit, each party to bear his own costs and attorneys' fees.

13. The parties represent and warrant that at all times referred to in the above-mentioned Action, no other persons have, or had, an interest in the causes of action set forth therein and that they have not sold, assigned, transferred, conveyed or otherwise disposed of any claim or demand relating to any matter covered by this Release.

(Emphasis added.) These provisions are unambiguous and underscore the parties' intent to settle and release, once and for all, any and all claims that had arisen during the litigation or that could arise from the administration of their father's trust, which necessarily includes ownership of the Ranch.[5] The plain language of the Settlement Agreement is far-reaching, and none of its provisions suggest that any claims that had arisen between the parties were exempted or not encompassed under the broad terms of the agreement. Finally, a reasonable person would understand the agreement's provisions settling "all claims that could or did arise between the parties, known or

_____

[5] "[T]he context in which the contract was written, including [its] subject matter, . . . purpose . . . and the circumstances surrounding its making," supports the conclusion that the parties' intended to settle all claims between them. *Am. Nat'l Bank v. Sara*, 246 P.3d 294, 297 (Wyo. 2011). In particular, the parties' purpose in entering the Settlement Agreement was to formalize the already agreed upon settlement and release of claims set forth in the Basic Terms. The Settlement Agreement itself indicates it is "based [in part] on . . . the terms of the [Basic Terms agreement]." The Basic Terms included a provision settling "all claims that could or did arise between the parties known or unknown," and this same language is repeated in the Settlement Agreement. And finally, after signing the Basic Terms, the parties filed a joint status report to the district court stating that "[a]t th[e] mediation, the Parties were able to reach a resolution concerning *all claims* between them." (Emphasis added.)

16

unknown," and mutually releasing "all claims, whether known or unknown, past, present, or prospective" to include all claims regarding ownership of the Ranch, as such claims arose between the parties during the litigation and were central to their dispute.[6]

Because the language of the Settlement Agreement is expansive, settling all known or unknown claims that could or did arise between the parties, the district court did not err in construing the agreement as a settlement and release of all claims related to ownership of the Ranch, including Charles's individual claim.

---

[6] No party disputes that claims regarding ownership of the Ranch, including Charles's alleged individual interest, arose between the parties. The district court made a factual finding on this point, concluding that Charles's "claims and contentions concerning ownership of the Larson Hereford Ranch lands and the Larson Hereford Ranch Partnership are known claims that DID arise between the parties to this case." The record supports the district court's determination.

For example, the Complaint contained allegations that the Partnership owned a one-half interest in the Ranch, that Arnold A. Larson had acquired the Partnership interests of Charles and David in order to transfer the entire Partnership and its one-half interest in the Ranch to Arny, and that the terms of the Trust dictate Arny is to receive all interests in the Partnership and Ranch. Although Charles initially admitted in his Answer that "fifty percent of the Larson Hereford Ranch is owned by the [Partnership]," he disputed the ownership of the Partnership and whether Arny should have received the one-half interest in the Ranch previously held by the Catherine N. Larson Trust. But in the JCMP, Charles changed his position and alleged that he may have an individual interest in the Ranch because the 1988 deed is unclear as to whether it "transferred the one-half interest [in the Ranch] to the Partnership or to the General Partners thereto in their personal capacities." Moreover, at oral argument, Charles conceded that "it is true that the question of the ownership of the Hereford Ranch did come into play" during the litigation, Oral Argument at 5:54–6:01, *Larson v. Larson*, No. 16-8065 (10th Cir. Mar. 23, 2017), and agreed that everyone acknowledged during negotiations that Charles had made a claim of individual ownership in the Ranch, *id.* at 8:59–9:34. Therefore, it is unmistakably clear that issues regarding ownership of the Ranch, including Charles's individual claims, arose between the parties during this litigation—and it is equally clear from the terms of the agreement that the parties intended to settle all such claims.

17

**B.**    *The PowerPoint Presentation*

Before the district court, Charles filed a Motion for Protective Order that sought to bar Arny and Arla from obtaining, through discovery, the presentation used by Charles's counsel during the mediation. A magistrate judge denied the motion, finding that the presentation was discoverable under Wyoming law and, in the alternative, that it did not constitute a protected communication under Colorado law. Shortly thereafter, at the evidentiary hearing held on May 19, 2016, the district court admitted the presentation and related testimony into evidence, over Charles's objection. Finally, in its order construing the Settlement Agreement, the district court relied, in part, on the presentation to determine that the agreement applies to the Ranch. Charles asserts on appeal that the magistrate judge and district judge erred by allowing the discovery and admission into evidence of the presentation. Although his brief focuses primarily on the issue of discoverability, Charles also specifically challenges the district court's consideration of the presentation when construing the terms of the Settlement Agreement. In response, Arny and Arla contend the presentation is discoverable under Wyoming and Colorado law, and that the Federal Rules of Evidence do not bar its admission into evidence. We review the magistrate judge's and district judge's determinations for abuse of discretion. *See Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1256 (10th Cir. 2016) ("[W]e review a district court's determination regarding the admissibility of evidence under an abuse of discretion standard." (internal quotation marks omitted)); *Frontier Ref.,*

18

*Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 699 (10th Cir. 1998) (applying abuse of discretion standard to district court's order compelling discovery).

We first examine whether the magistrate judge erred in holding that the presentation was discoverable. The parties dispute which State's laws should control this issue, as application of Colorado law leads to a different result than the application of Wyoming law. In general, the Colorado Dispute Resolution Act "protects as confidential" mediation communications[7] that are "made in the presence or at the behest of the mediator." *Yaekle v. Andrews*, 195 P.3d 1101, 1110 (Colo. 2008); *see also* Colo. Rev. Stat. § 13-22-307. In contrast, Wyoming law expressly allows discovery of confidential mediation communications when a party seeks judicial enforcement of a purported mediated settlement agreement. *See* Wyo. Stat. Ann. § 1-43-103 (stating that while a party normally "has a privilege to refuse to disclose and to prevent all mediation participants from disclosing confidential communications," no privilege exists if "[o]ne of the parties seeks judicial enforcement of the mediated agreement"). Although the parties conducted the mediation in Denver, Colorado, and agreed in their mediation agreement that "[a]ll communications, whether oral or written, made in the course of the mediation process . . . are confidential by this agreement and the Colorado Dispute Resolution Act,

---

[7] The Colorado Dispute Resolution Act defines mediation communications as "any oral or written communication prepared or expressed for the purposes of, in the course of, or pursuant to, any mediation services proceeding." Colo. Rev. Stat. § 13-22-302(2.5).

19

C.R.S. 13-22-301, et[.] seq.,"[8] the lawsuit was filed in Wyoming. As a result, the

magistrate judge applied Wyoming's choice of law rules to determine which State's

law should govern the discoverability of the presentation. Applying these rules, the

magistrate judge concluded that although Wyoming's choice of law rules state that

"[t]he law of the state chosen by the parties to govern their contractual rights and

duties will be applied," *Res. Tech. Corp. v. Fisher Sci. Co.*, 924 P.2d 972, 975 (Wyo.

1996), this general rule was overridden by the longstanding principle that Wyoming

courts will "not apply another jurisdiction's law 'when it is contrary to the law,

public policy, or general interests of Wyoming's citizens.'" Aplt. App. 663 (quoting

*Res. Tech. Corp.*, 924 P.2d at 975). Therefore, the magistrate judge applied Wyoming

law and allowed discovery of the presentation.

We conclude the magistrate judge did not err in his decision. Rule 26 of the

Federal Rules of Civil Procedure provides that a party may discover any

nonprivileged matter relevant to the party's claim or defense, as long as it is

proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). In diversity

jurisdiction cases such as this one, "state law governs privilege regarding a claim or

defense for which state law supplies the rule of decision." Fed. R. Evid. 501; *see also*

*Frontier Ref.*, 136 F.3d at 699 (finding Rule 501 "provides that state law supplies the

rule of decision on privilege in diversity cases"). Here, to determine which State's

---

[8] The mediation agreement also contains limits to its confidentiality
provisions, stating that "evidence previously disclosed or known to a party, or that is
otherwise admissible or discoverable shall not be rendered confidential, inadmissible,
or not discoverable solely as a result of its use in the mediation."

privilege laws control, we look to Wyoming's choice of law rules. *See R&G Elec., Inc. v. Devon Energy Corp.*, 53 F. App'x 857, 859 (10th Cir. 2002) (unpublished) ("In diversity cases, we must apply the substantive law of the forum state, including its choice of law rules."); *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996) (stating in diversity jurisdiction actions "we apply the substantive laws of the forum state, including its choice of law rules," and that "[i]n doing so, we must apply the most recent statement of state law by the state's highest court" (internal quotation marks omitted)).

Although Wyoming, the forum state in this case, has not expressly adopted the entirety of the Restatement (Second) of Conflict of Laws ("Second Restatement"), it regularly follows the Second Restatement's approach in resolving choice of law questions. *R&G Elec.*, 53 F. App'x at 859; *see also Res. Tech. Corp.*, 924 P.2d at 975. "Under Wyoming choice of law rules, the law of the state chosen by the parties to govern their contract presumptively applies." *R&G Elec.*, 53 F. App'x at 859; *see also* Restatement (Second) of Conflict of Laws § 187. But Wyoming will not apply the law of another state "when it is contrary to the law, public policy, or the general interests of Wyoming's citizens." *Res. Tech. Corp.*, 924 P.2d at 975; *see also R&G Elec.*, 53 F. App'x at 859 ("If . . . the parties select foreign law contrary to the law, public policy, or the general interests of Wyoming's citizens, Wyoming courts will not enforce the parties' choice of law provision."); Restatement (Second) of Conflict of Laws § 187 ("The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . [unless] application of the law of the

21

chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue."). As the magistrate judge found, Wyoming and Colorado law directly conflict with respect to whether confidential mediation communications are subject to discovery when a party attempts to judicially enforce a settlement agreement.[9] *Compare* Wyo. Stat. Ann. § 1-43-103, *with* Colo. Rev. Stat. Ann. § 13-22-307.[10]

As a result, the magistrate judge did not err in applying Wyoming law and allowing discovery of the presentation.

In addition to questioning the discoverability of the presentation, Charles appears to challenge the district court's decision to admit the presentation into evidence during the hearing. Although Charles objected to the introduction of the presentation at the hearing, he does not sufficiently raise this issue on appeal. Instead, he merely notes that the district court "admitted the presentation into evidence over Charles' objection," but "made no distinction in those rulings between whether such

---

[9] Although Charles states in a conclusory manner that Colorado and Wyoming law do not conflict, he offers no argument or law to support his contention.

[10] A separate provision of the Second Restatement supports this result. Section 139(2) of the Second Restatement provides in relevant part:

> Evidence that is privileged under the local law of the state which has the most significant relationship with the communication [(Colorado)] but which is not privileged under the local law of the forum [(Wyoming)] *will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect.*

Restatement (Second) of Conflict of Laws § 139(2) (emphasis added).

materials were discoverable materials and/or additionally were admissible materials."

Because Charles provides no reasoned analysis or citation to relevant authority, this

argument is inadequately briefed and therefore waived. *Therrien v. Target Corp.*, 617

F.3d 1242, 1252–53 (10th Cir. 2010) (holding failure to raise an argument

sufficiently in the opening brief waives that argument); *United States v. Pursley*, 577

F.3d 1204, 1228 (10th Cir. 2009) (noting that because the appellant did not justify or

cite a single case in support of his position, the court was "free to end [its] inquiry by

applying the principle that arguments inadequately briefed in the opening brief are

waived" (internal quotation marks omitted)).

Furthermore, even if the district court had abused its discretion in admitting

the presentation, either because it should not have been subject to discovery or is

inadmissible under the Federal Rules of Evidence, the abuse would constitute

harmless error. Here, "reversal [of the district court] is not appropriate unless the

error prejudicially affected a substantial right of a party or if we reasonably conclude

that the exclusion [or admission] of . . . evidence led the [factfinder] to reach a

contrary result." *See Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 886 (10th Cir.

2006). The district court's reliance on the presentation was cumulative of other

admissible evidence, including the Complaint, Answer, and JCMP. *See Am. Nat'l*

*Bank*, 246 P.3d at 297 (noting courts may consider evidence extrinsic to the contract

"to help ascertain what the parties intended when they made the contract"). These

admissible materials include evidence supporting the district court's conclusion that

claims of ownership in the Ranch and Partnership, including Charles's individual

claims, were not only "known claims that . . . ar[ose] between the parties to this case," but "were the main issues in the case" and therefore subject to the Settlement Agreement. As a result, even if the district court had erred in considering the presentation—an issue we do not decide—reversal on that ground would be inappropriate because it did not prejudicially affect any of Charles's substantial rights and its exclusion would not have lead the district court to reach a contrary result.

Finally, Charles's argument that the district court's consideration of the presentation amounts to reliance on prohibited parol evidence is unavailing, as Wyoming law permits consideration of extrinsic evidence to ascertain and confirm the parties' intent when entering a contract. *See id.*; *In re Mark E. Dowell Irrevocable Trust #1*, 290 P.3d at 361.

### C. *The District Court's Consideration of the JCMP*

As is evident from the principles governing contract construction under Wyoming law, Charles's contention that the district court committed reversible error by considering the JCMP is unavailing. It is undisputed the district court considered the JCMP when making factual and legal determinations regarding the parties' intent and the scope of the Settlement Agreement. Wyoming law permits consideration of such material when it provides information regarding the subject matter, purpose, and circumstances surrounding the making of a contract. *See Am. Nat'l Bank*, 246 P.3d at 297. The JCMP provides such information, as it details the claims and contentions regarding distribution of the Trust, and ownership of the Ranch, raised during the

24

litigation and settled in mediation. As a result, the district court did not err in considering it.

## III.   CONCLUSION

For the reasons set forth above, we AFFIRM the district court's construction of the Settlement Agreement.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

25